**MARKOWITZ & COMPANY,**
**Plaintiff-Appellee-Crossappellant,**

v.

**TOLEDO METROPOLITAN HOUSING AUTHORITY et al.,**
**Defendant-Appellant-Crossappellee.**

**Nos. 77–3230, 77–3231.**

United States Court of Appeals, Sixth Circuit.

Argued Feb. 20, 1979.

Decided Nov. 13, 1979.

William M. Connelly, Toledo, Ohio, for defendant-appellant-crossappellee.

Robert E. Kopp, Neil H. Koslowe, Dept. of Justice, App. Section, Civ. Div., Washington, D.C., for amicus curiae USA.

Cary Rodman Cooper, Hayward, Cooper, Straub, Walinski & Cramer, John Czarnecki, Richard S. Walinski, Toledo, Ohio, for plaintiff-appellee-crossappellant.

Before EDWARDS, Chief Judge, MERRITT, Circuit Judge, and PECK, Senior Circuit Judge.

PECK, Senior Circuit Judge.

This is a complicated diversity breach of contract case, with a flurry of claims and counterclaims, appeals, and crossappeals. The parties are the plaintiff, Markowitz & Co. [Markowitz], a Michigan building contractor; the Toledo Metropolitan Housing Authority [TMHA], accused of breach of contract; and Almour Securities, accused of conspiring to deprive Markowitz of the benefit of its contract with TMHA. Almour asserted its foreclosure action against Markowitz as a counterclaim. At trial, Markowitz prevailed on the breach of contract claim and was awarded $925,139.47 in damages against TMHA. Both Markowitz and TMHA appeal that judgment, Markowitz contending that the trial judge applied an improper measure of damages, excluding damages which should have been recoverable, and TMHA contending that it is not liable at all, but that in any case the trial judge applied an improper and overly generous measure of damages. Almour's foreclosure is complete, and there is no remaining dispute as to that aspect of the case except whether Almour should be entitled to its 15% contractual interest on its note during the period it was attempting to assert its foreclosure action in state court. Markowitz lost its conspiracy complaint against Almour, and has not appealed that ruling.

## THE BACKGROUND OF THE DISPUTE

The dispute arose out of the construction of a group of low-rent apartment duplexes, which in 1968 TMHA agreed to lease from Markowitz on completion. In the public housing industry, financing is normally obtained on the strength of "letters of intent" to lease issued by the housing authority; the letters are binding promises to lease after construction and thus guarantee the cash flow to assure repayment of the loan. Markowitz obtained such a letter from TMHA for fourteen duplexes, and then obtained financing from Almour. The Letters of Intent contained a 20-year lease commitment, at a fixed rent, though Markowitz had the option of terminating the lease at five-year intervals. Over the next few months, Markowitz continued to negotiate with TMHA, and eventually obtained Letters of Intent for a total of 71 duplexes, and obtained a promise of financing from Almour, conditioned on satisfactory completion of the first group of 14 buildings. Construction on the first 14 duplexes began in September of 1969. Competent, well-respected subcontractors were hired, and work progressed well until December. At that point, the buildings were close to completion, and the project was ahead of schedule. On December 18, A. Gideon Spieker, chairman of the board of TMHA, arrived at the construction site to conduct a personal inspection of the project. Spieker told an Almour representative present at the site that he knew nothing about the project,

that as far as he was concerned, TMHA would not lease the buildings, and that Almour, as the lender, should "look into it." Since all concerned were well aware of the crucial necessity of the TMHA lease commitment in order to finance the construction, work faltered and slowed over the next few weeks, and finally came to a halt in mid-February when Almour decided not to risk any more of its funds. During the same few weeks, Markowitz tried to no avail to obtain assurances from TMHA that it would indeed honor its lease commitment; both Markowitz and Almour were told that TMHA did not intend to lease the buildings. At about the time construction finally ground to a halt, with the buildings 95% complete, the president of Markowitz was arrested on an unrelated charge. According to TMHA, this arrest was the source of all the problems with the construction, but the district court found that it in fact had no effect on anyone concerned, and that it was an "unrelated matter." Subcontractors who had not been paid at the time Almour stopped the flow of funds began filing liens against the project.

In an attempt to salvage the project, Markowitz began negotiating with TMHA, offering to sell the buildings to it. On January 14, TMHA passed a resolution to "take under advisement" the subject of leasing or purchasing the dwellings, and finally, in March, agreed to purchase the buildings. A purchase agreement was not signed until June, 1970, however. In the interim, all work had stopped on the buildings, and considerable damage was done by vandals and weather exposure.

Armed with the acquisition commitment, Almour again began releasing funds to subcontractors, and work began again. Within a few weeks, however, a series of articles appeared in the Toledo *Blade*, reporting that according to Spieker, TMHA had no agreement with Markowitz, and that it had no intention of purchasing the project. Once again the project became idle, and in spite of attempts by Markowitz to contact the members of TMHA, seeking assurances that the agreement would be honored, TMHA director Carl Barrett admitted un-

der cross-examination that he had never answered Markowitz's letters or retracted any of the statements made to the *Blade* reporters. Because of this forced inaction, the buildings were not completed on August 9 when the sale was to have been closed.

This time, Markowitz filed suit. However, during settlement negotiations, yet another agreement to sell was reached. The project was finally completed in all but details, but on December 21, 1970, TMHA announced in a letter to Markowitz that it would not go through with the purchase, stating that Markowitz's "inaction" and unsatisfactory workmanship made the sale impossible, although occupancy certificates had already been issued for many of the buildings. This time, Almour commenced foreclosure proceedings. A receiver was appointed, the buildings were quickly completed at very little additional cost, and rented to tenants.

The trial of this action was conducted in three parts. The first phase of trial dealt with TMHA's defense that Markowitz, rather than TMHA, had breached the final settlement agreement because the buildings were substandard. The trial judge ruled that the buildings were properly constructed and in accordance with all plans and specifications. The second phase of trial dealt with the issue of liability. The court found that TMHA had breached its original agreement to lease, and then had breached each of the succeeding settlement agreements to purchase. It also ruled that the settlement agreements were executory accords, and that their breach left Markowitz with the option of proceeding to judgment on the original agreement to lease or on the subsequent agreement to sell. Markowitz elected to seek damages under the lease agreement, and the third phase of trial dealt with the measure of damages. The district court granted Markowitz the present value of the lease on the 14 buildings, plus consequential damages suffered as a result of the foreclosure. He denied all damages claimed as a result of the loss of the commitment to lease an additional 57 duplexes, however, and refused to take

projected increases in value of the property or rental increases into account in determining the present value of the lease.

■ This statement of the facts has been drawn from the undisputed facts of the record and from the various opinions of the district court. This is an appropriate point to pause to mention a problem with this case with which an appellate court should never have to grapple: attempting to sift fact from fiction in the brief presented on behalf of the TMHA. Pragmatically, this Court is required to tolerate a considerable laxness and just plain loose writing in the briefs it considers, but a misleading or inaccurate statement of fact is quite another matter. Appellate counsel's professional duty requires scrupulous accuracy in referring to the record, and we should not be required to pore over an extensive record as an alternative to relying on counsel's representations. In a case such as this, where issues of historical fact are bitterly contested, the parties are free to explain their version of events to the Court, as long as it is clear that it is just their version, and as long as both the findings of the trial court and their opponent's position are also accurately and fairly presented. We remind counsel that this Court is bound by factual determinations of the district court, absent a finding of a clear error, and those determinations must always be the starting place in any statement of facts for appellate review.

■ Furthermore, we repeat our frequent admonition that the statement of facts is not a vehicle for argument. We are fully aware that even a scrupulously honest, straightforward summary of facts of a case can be so written as to be persuasive in favor of one side or the other; that is good briefwriting and is of course acceptable. But such argumentative language, found in TMHA's statement of facts, as stating that the trial court's findings are "astonishing," and "extraordinary," or describing an opponent's position as "ludicrous" is not acceptable.

However, more serious than the argumentative posture TMHA assumes in explaining this case to the Court are the numerous factual misrepresentations contained in its 35-page statement of facts, and its total failure to make any distinction between facts found by the district court after hearing all the evidence, and "facts" as urged by TMHA. It is crucial that this Court be able to rely upon representations of counsel as accurate and honest; TMHA's brief is neither.

As one of a considerable number of available examples to illustrate our point, in its brief TMHA asserts, as fact, that it never breached the contract of sale because Spieker's "purported" remarks, quoted in the Toledo *Blade* stories, were never "confirmed" by Markowitz and "Mr. Markowitz did not bother to ask." TMHA's clear implication is that the stories were inaccurate, that it never intended to breach its agreement to purchase the buildings, and that if Markowitz had "bothered" to contact it, TMHA would have cleared the whole matter up. Apparently TMHA feels that it is free to ignore the record evidence in order to present the most favorable version of events possible. We refer it to the letter from G. Mark Brown, attorney for Markowitz, dated July 31, 1970, demanding a retraction of the statements in the *Blade* story, Mr. Barrett's admission that he never answered the letter, and TMHA's answer to Markowitz's interrogatory to the effect that the newspaper story reflected the official position of TMHA.

We trust that counsel for TMHA will heed our admonition in future practice before this Court.

## THE ISSUES ON APPEAL

■ **Breach of the lease agreement:** TMHA's first argument on appeal is that the trial court erred in concluding that TMHA had breached the first lease agreement. TMHA contends that as a matter of law, Spieker's remarks at the construction site were not sufficient to constitute an anticipatory repudiation of the contract, because Spieker was not authorized to speak for the Board, because his remarks were not

"clear and unequivocal," because the remarks were not made to the other party to the contract, and because TMHA subsequently reaffirmed its commitment to lease in its January resolution.

These objections wholly miss the mark, because even if Spieker's remarks did not constitute an anticipatory repudiation, TMHA's subsequent response to Markowitz's attempts to obtain assurances that the contract would be honored surely did. As the district court found, Spieker's remarks merely "commenced the difficulties" with a project that had been progressing smoothly up to that point.

It is basic contract law that once reasonable grounds exist to believe that the other party to a contract may not perform, a party may demand reasonable assurance of performance, and if such assurance is not forthcoming within a reasonable time, may treat the failure to provide assurance as a breach. With regard to commercial contracts, that rule is codified in the Uniform Commercial Code § 2–609, which reflects the general rule of law. This case presents a textbook example of the situation. Spieker, chairman of the board of one of the parties, personally repudiated the contract. This certainly constituted "reasonable grounds" to fear that TMHA might not go through with its contract. Markowitz immediately demanded assurances from TMHA, which were not forthcoming. In fact, Markowitz received only further denials that TMHA intended to lease the buildings. TMHA's subsequent resolution to "take under advisement" either the leasing or the purchase of the buildings was hardly adequate to constitute assurance of performance, since it was not an assurance at all.

We find adequate and substantial support in the record to support the district court's finding that TMHA breached the agreement to lease.

**Waiver or abandonment of the breach:** TMHA next contends that Markowitz lost any rights it had under the lease agreement when it failed to immediately file suit and instead entered into an agreement to sell the property to TMHA. It bases this argument on its position that the sale agreement was a substituted contract, which completely extinguished the prior contract and Markowitz's rights under that contract. The district court concluded and Markowitz contends, that the sale agreement was an executory accord, a compromise agreement which suspends but does not extinguish rights under a prior contract until the new contract is satisfactorily performed.

The crucial issue is whether the new contract was a substituted contract, meaning that Markowitz's rights, if any, are for breach of the sale agreement; or an executory accord, meaning that Markowitz may either proceed on its rights under the new contract, or treat the second breach as rescission. The plaintiff then reverts to its status which existed prior to the compromise agreement, and has whatever rights and remedies it had at that time. In Ohio, the burden of proving that a new contract is a substituted contract rests on the party that sets it up as a defense to a claim, in this case, TMHA. *Rudolph v. Conrad Seyfarth Construction Co.*, 118 Ohio App. 218, 192 N.E.2d 503 (1963).

Since the sale agreement did not specify whether it was intended to extinguish the lease agreement or merely suspend it until the sale agreement was fully performed, the circumstances surrounding the agreement and the testimony of the parties concerning the agreement must be considered to determine their intention. We find substantial evidence to support the district court's conclusion that upon breach of the sales agreement, Markowitz was entitled to treat it as a rescission and assert its original rights under the lease. We can see no reason why Markowitz would have abandoned its rights under the lease agreement in return for a mere promise to purchase, especially in view of TMHA's record of vacillation and procrastination. While it may have been willing to accept a completed sale as satisfaction, in order to salvage the project and avoid the necessity of a protracted suit to protect its rights, there is no reason why Markowitz would have ac-

cepted the sale agreement as a substituted contract instead of an executory accord. Furthermore, an opposite interpretation would place TMHA in the position of having benefited from its own wrong, by forcing a new and more favorable agreement as a result of its first breach, and then being liable only for the lesser damages caused by its second breach. In the absence of a clear indication, which nowhere exists in this record, that Markowitz intended to abandon its rights under the lease agreement simply by entering into the new sale agreement, we conclude that the district court made a reasonable finding supported by credible evidence.

■ **Breach of the June 9 Agreement:** As the trial judge recognized in first trying this aspect of this case, if TMHA did not breach the June 9 sale agreement, then there is no further issue remaining, since Markowitz is only entitled to proceed on its cause of action under the lease agreement if TMHA did not perform its obligations under the executory accord. TMHA contends that it did not breach the sale agreement because the *Blade* newspaper articles did not constitute an anticipatory repudiation, and Markowitz did not tender performance, as agreed, on or before August 9. The trial judge concluded, once again, that the articles gave Markowitz reasonable grounds to fear repudiation, that its demands for assurances did not produce an adequate response from TMHA, and that Markowitz's inability to complete the buildings by August 9 was entirely due to TMHA's breach. We find adequate evidence in the record to support the district court's conclusions. Not only did TMHA never repudiate the newspaper articles or answer Markowitz's letters demanding reaffirmation of the contracts, but it admitted in its interrogatory answers that the articles reflected its official position. We can find no support for TMHA's argument that Markowitz would have been unable to tender performance on August 9 even if it had not breached the agreement; the buildings were almost complete at that point, and in fact were subsequently completed and rented with very little additional work or expense.

■ Thus we conclude that the trial court's conclusions that TMHA breached both the lease agreement and the sale agreement, and that the sale agreement was an executory accord which on breach left Markowitz with the option of seeking damages for the breach of the original, more valuable lease agreement, are legally and factually sound. Having chosen to proceed on the cause of action under the lease agreement, Markowitz is entitled to recover the damages it suffered as a result of that breach.

■ **The Proper Measure of Damages:** Both Markowitz and TMHA dispute the measure of damages used by the district court. However, we conclude that the district court used a proper and reasonable measure of damages, supported by the evidence, and we affirm that portion of the case as well. Again, briefly, the district court attempted to place Markowitz in as good a position as it would have been in if TMHA had not breached, by awarding the present value of the lease of the 14 duplexes, plus consequential damages suffered as a result of the mortgage foreclosure which followed TMHA's breach. It did not award any damages at all for the loss of the agreement to lease an additional 57 duplexes, and refused to take projected rent increases and increases in the value of property into account in determining the value of the lease.

■ Markowitz argues that under the doctrine of prevented performance, it should be allowed to recover the loss of the bargain on the unbuilt duplexes. While we do not condone TMHA's conduct, nevertheless the Letters of Intent were unilateral contracts conditioned on construction of the buildings by Markowitz, which could be withdrawn by TMHA before Markowitz commenced performance. If Markowitz had acted in reliance upon the promises to its detriment, damages would be recoverable, or, in a proper case, reliance might render the offer irrevocable, but we see nothing in this case to justify such a reme-

dy. The district court was correct in its determination that Markowitz was not entitled to damages for the revocation of the offer to lease those buildings not yet under construction.

Markowitz's contention that the district court was in error in refusing to take increased rentals and land values into account in calculating his award of damages is also without merit. The uncertainties of valuation are frequently so great that all that can be hoped for is an honest and reasonably intelligent estimation, especially in a case where the breach carries consequences twenty years into the future. The trial judge's task was to attempt, as nearly as possible, to compensate Markowitz today for the value of what it has lost as a result of TMHA's breach. Calculating that value on the basis of the rental agreed to in the Letters of Intent, plus the residual value of the property it has lost based upon today's fair market value discounted for time and depreciation, is a fair and reasonable way of calculating the value of what Markowitz lost. In brief response to TMHA's argument that this award constituted an improper award of future profits, we note that TMHA is confusing the benefit of the bargain, the present value of the cash flow which would have been generated by the contract itself had it not been breached and which is clearly a proper element of damages, with speculative future profits. There is nothing in the least speculative or unforeseeable about Markowitz's loss here; in fact, TMHA's own expert calculated the value of the lease at only 14% less than the value calculated by the district court, using a slightly higher rate of discount and estimating slightly greater expenses.

**Consequential Damages and the Mortgage Loss:** The district court assessed as consequential damages the losses borne by Markowitz as a result of Almour's foreclosure of the mortgage. Ohio law on consequential damages is in accord with the general contract law on the subject. A plaintiff is entitled to recover such damages as "arising naturally, that is, according to the usual course of things, from such breach of contract itself . . . [or] such as may reasonably be supposed to have been in the contemplation of both parties at the time they made the contract as the probable result of the breach of it." *Midvale Coal Co. v. Cardox Corp.*, 157 Ohio 526, 530–1, 106 N.E.2d 556, 559 (1952). We accept the proposition that in the normal course of negotiating a commercial lease it may not be foreseeable that a "natural consequence" of breach of the lease would be that the owner of the property would suffer foreclosure and the attendant losses. Nevertheless, we find it beyond dispute that TMHA was fully aware of the role its Letters of Intent played in the financing of public housing and knew that the cash flow expected to be generated by its rental payments would be the sole source of the funds to pay off the mortgage obligations. TMHA is not in the position of a breaching tenant faced with a landlord who is unexpectedly insolvent and unable to meet mortgage payments without the rent; it was fully aware of its role in the entire deal, and aware that if it failed to meet its obligations the project would inevitably collapse. Under the circumstances, the consequential damages suffered by Markowitz as a result of the mortgage foreclosure were properly assessed to TMHA.

Apparently the district court used a "simple interest" as opposed to a "compound interest" factor[1] to compute (a) the amount of the rental income presently due under the lease, (b) the present value of rental income to become due under the lease, and (c) the present value of the residual leasehold property. Further, the district court used a 20-year discount period instead of a 14½-year discount period when making its present value computations as to the residual property. (A period of 14½ years remained in the lease on the date of

1. When using compound interest, interest on the principal is computed at the end of each term and is added to the principal balance.

Thus, in each succeeding term, interest is paid, not only on "principal," but also on accrued interest.

judgment.) Although, in these respects, the district court's damage award arguably involved computational errors which, if corrected, would reduce the overall award by several thousand dollars, TMHA has not raised any of the possible errors on appeal. In our discretion, we decline to review.

 **Denial of request for a jury trial and request that the trial judge recuse himself:** After the liability portion of the trial had been concluded adversely to TMHA, it requested a jury trial for the damages portion of the trial, or, in the alternative, that the trial judge recuse himself. We see no abuse of discretion in the district judge's denial of these motions. This was a very complicated trial, and to interject a jury at such a late stage in the proceedings would have caused an extended and entirely unwarranted delay. We will not interfere with the best judgment of the district court on this issue. Furthermore, we see no reason why the judge should have recused himself. We find no comments or actions which were unwarranted or unsupported by the record, and see no indication of any bias or prejudice in his findings of fact or conclusions of law. It is clear, in view of the voluminous record in this case and the thorough, detailed work of the district judge that both parties received a fair, impartial hearing. The fact that the defendants lost, and were chastised for their conduct as public servants in breaching these contracts, can hardly be viewed as evidence of bias or partiality. We likewise see no abuse of discretion on the part of the district judge in allowing Almour to intervene with its foreclosure action after unsuccessfully attempting to pursue that action in state court. Such decisions are within the province of the trial judge.

The decision and award of damages in this case are affirmed in all respects.