ENGLEWOOD TERRACE LIMITED PARTNERSHIP, a Michigan Limited Partnership, Plaintiff,

v.

UNITED STATES, Defendant.

No. 03–2209C.

United States Court of Federal Claims.

July 30, 2010.

 

Donald S. Samuelson, Law Offices of Donald S. Samuelson, Lake Forest, Illinois, Peter V. Baugher, Schopf & Weiss, Chicago, Illinois.

Douglas K. Mickle, Senior Trial Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C., for the defendant. With him were Christopher A. Bowen, Trial Attorney, Commercial Litigation Branch, Tony West, Assistant Attorney General, Jeanne E. Davidson, Director, Commercial Litigation Branch and Brian M. Simkin, Assistant Director. Of counsel, Gregory G. Gustin, Maria T. Baguio, Lorraine C. Shoto, and Jaret R. Fishman, Office of General Counsel, United States Department of Housing and Urban Development, Chicago, Illinois.

## OPINION

HORN, Judge.

### FINDINGS OF FACT

The court issued an earlier opinion in Englewood Terrace Limited Partnership (Englewood), finding that defendant had breach-

ed the 2000 Housing Assistance Payment (HAP) contract. *See Englewood Terrace Ltd. P'ship v. United States,* 79 Fed.Cl. 516 (2007) (Englewood II).[1] The court also previously determined that plaintiff is not entitled to an energy reimbursement or a budget based rent increase and that plaintiff could not offer a new theory of recovery to request an Operating Cost Adjustment Factor rent increase on a motion to reconsider after trial and after the court had issued an opinion denying plaintiff's budget-based rent increase claim. *See Englewood Terrace Ltd. P'ship v. United States,* 84 Fed.Cl. 649 (2008) (*Englewood III*); *Englewood Terrace Ltd. P'ship v. United States,* 86 Fed.Cl. 720 (2009) (*Englewood IV*). The extensive findings of fact in the court's earlier opinions will not be repeated here, but are incorporated into this opinion. Relevant facts, specifically related to this opinion, are repeated below for ease of reference.

Englewood alleged, and the court agreed, that the United States Department of Housing and Urban Development (HUD) breached a HAP contract between Englewood and HUD. The HAP contract provided for rent subsidies to be used by the tenants of South Pointe Towers, a high-rise apartment building in Chicago, Illinois. South Pointe was owned by Englewood Terrace Limited Partnership. John J. Hayes was the President of P.M. Group, the Englewood Terrace Limited Partnership's general partner, until December 13, 2002. Mr. Hayes' P.M. One was the managing agent at South Pointe. On December 13, 2002, DSSA New Englewood Terrace LLC (DSSA), a sole proprietorship of Donald S. Samuelson, replaced P.M. Group as Englewood's general partner. Earlier, on

December 1, 2001, Mr. Samuelson's DSSA Management, Inc., which was affiliated with Mr. Samuelson's DSSA New Englewood Terrace LLC, replaced P.M. One as South Pointe's managing agent.

The HAP contract at issue was executed in October 2000 and called for a one year term, followed by three, automatic one year renewals, which would have continued the contract through September 2004. This court previously found that, in December 2000, HUD unilaterally amended the contract, without Englewood's authorization, into one consisting of a series of short term agreements with no automatic renewals. The short term agreements permanently ended in September 2002. The court held that HUD "should be held to the terms of the original HAP contract it made in October, 2000." *Englewood II,* 79 Fed.Cl. at 535.

Englewood's complaint stemmed from HUD's termination[2] of Englewood's HAP contract with HUD. The HAP contract at South Pointe ended on September 30, 2002, after the final short term agreement expired and all tenants had been given housing vouchers permitting them to either remain at South Pointe or relocate to other housing with their vouchers. HUD based its termination of the HAP contract on its finding that Englewood had not provided decent, safe and sanitary housing to tenants, as required by the HAP contract. The specific basis for the termination of the HAP contract cited by HUD was a March 2, 2001, HUD inspection of South Pointe. After a trial, this court found that HUD's decision to terminate Englewood was made even before HUD re-

1. *Englewood I* was an opinion issued by Judge Victor J. Wolski, the original judge assigned to the case, see *Englewood Terrace Limited Partnership v. United States,* 61 Fed.Cl. 583 (2004). Some time later, the case was re-assigned to the undersigned judge, who issued *Englewood Terrace Limited Partnership v. United States (Englewood II),* 79 Fed.Cl. 516 (2007), *Englewood Terrace Limited Partnership v. United States (Englewood III),* 84 Fed.Cl. 649 (2008) and *Englewood Terrace Limited Partnership v. United States (Englewood IV),* 86 Fed.Cl. 720 (2009). This opinion on damages becomes *Englewood V.*

2. The court notes that the word "termination" is not used consistently throughout the record. To

clarify, on November 30, 2001, HUD issued to Englewood a "Notice of Abatement and Termination" stating that HUD planned to phase out the HAP contract in stages, as it issued Chicago Housing Authority (CHAC) vouchers to tenants. Issuing the CHAC vouchers took longer than HUD originally intended, and so it proceeded to extend the contract for short-term renewal periods, the last of which expired on September 30, 2002. HUD also informed Englewood that the contract would officially end when CHAC vouchers were distributed to all the tenants, which, as is discussed more fully below, while not clear in the record, is determined to have happened by July 2002. *Englewood II,* 79 Fed.Cl. at 518, 522.

ceived Englewood's plan to correct deficiencies identified in the March 2, 2001 HUD inspection. The court concluded that Englewood was not afforded a full and meaningful opportunity to cure the deficiencies identified in the March 2, 2001 HUD inspection. The record reflects that, although HUD had urged that South Pointe be placed under new ownership and management, once new management and ownership was in place, there appeared to be a reluctance on the part of HUD to provide a meaningful opportunity for the new ownership and management, under Mr. Samuelson, to take corrective action, or for HUD to even acknowledge any improvement at South Pointe. HUD's posture thereby undermined its contract termination action against Englewood.

On October 1, 2001, Edward Hinsberger, Director of the Chicago Office of Multifamily Housing for HUD, sent an email to Mr. Hayes and Mr. Samuelson stating that "[t]he [Chicago] Housing Authority has advised us that they will begin issuing vouchers for the residents at South Pointe today.... As a result, the Sec. 8 contract will be terminated once all of the residents receive their vouchers." Mr. Hinsberger alleged at trial that vouchers did not begin to issue until June of 2002. Mr. Hinsberger also testified at trial that he had told residents on October 1, 2001 that they would be receiving vouchers and "wasn't about to ... turn around and say never mind, you're not going to get them."

The occupancy rate at South Pointe began to decline in the spring of 2002. It dropped below 85% in April 2002 and below 70% by June 2002. It continued to decrease steadily through October 2002, the month following the expiration of the HAP contract, when the occupancy rate dwindled to 35%. HUD phased out the HAP contract in stages. HUD would permanently cease to pay a HAP subsidy for a specific unit whenever its tenant used the Chicago Housing Authority (CHAC) voucher, either to leave, or, if the

unit was acceptable, to remain at South Pointe. HUD also permanently stopped HAP payments when a unit that had received the subsidy became vacant for any other reason.[3] During this time, the costs to run South Pointe remained constant for Englewood, and it continued to pay high interest payments on its loan from Community Investment Corporation (CIC).

In January 2002, Englewood defaulted on its CIC loan. CIC filed a foreclosure action, which was voluntarily withdrawn in March 2002, and then reinstated in May 2002. CIC withdrew the action a second time after it received assurances that Englewood would obtain a new loan, insured by HUD, which would pay off the entire old mortgage and provide funds for a complete rehabilitation of South Pointe. This second loan was provided through Reilly Mortgage, a private financial institution, but was insured by HUD against default through the section 221(d)(4) loan program.[4] The section 221(d)(4) loan program, according to the HUD website, requires the property owner to use the loan funds for new construction or "substantial rehabilitation." *Mortgage Insurance for Rental and Cooperative Housing: Section 221(d)(3) and Section 221(d)(4)*, http://www.hud.gov/offices/hsg/mfh/progdesc/rentcoophsg221d3n4.cfm. The Project Development Office of HUD closed on the HUD-insured loan in December of 2002. Englewood also received an additional loan of $750,000.00 from the Illinois Housing Development Authority (IHDA) at this time.

In *Englewood II*, the court observed that the parties had confused repairs mandated by the 2001 Real Estate Assessment Center (REAC) report and repairs that were to be carried out under the section 221(d)(4) loan. The HUD-insured, section 221(d)(4) loan required that Englewood restore South Pointe to "like new" condition, a standard that went beyond the decent, safe and sanitary condi-

---

**3.** A HAP contract is building specific, and by living in a building that has a HAP contract, an eligible tenant receives subsidized rent. A CHAC voucher, on the other hand, can be used by the tenant anywhere the CHAC has approved for its use. When a tenant elected to use its voucher, even if it was at South Pointe, Englewood ceased

to receive a HAP subsidy from HUD and instead received a voucher payment from the CHAC.

**4.** The program is pursuant to the National Housing Act, codified at 12 U.S.C. § 1715l (2006). Program regulations and eligibility requirements are found at 24 C.F.R. § 221.501 (2009).

tion requirement of the 2000 HAP contract and REAC inspection. *Englewood II*, 79 Fed.Cl. at 544. The section 221(d)(4) rehabilitations required that two to three floors of South Pointe would remain unoccupied while the building was being renovated, the REAC repairs, on the other hand, could be performed while the tenants lived in the units.

After the loss of the HAP contract, Englewood struggled to attract new tenants. To advertise the building, it placed articles in local papers and printed marketing brochures. Englewood also made efforts to retain current South Pointe tenants who were financially responsible and to encourage problematic tenants to use their vouchers elsewhere. In addition, Englewood also actively recruited other voucher tenants from the Chicago Housing Authority offices. Through these efforts, it filled approximately fifty-five more units at South Pointe by September 2003. This placed its vacancy rate at around 56%.

In the spring of 2004, after depleting all the funds loaned to it, Englewood defaulted on the HUD-insured, section 221(d)(4) mortgage. Reilly Mortgage, which had made the loan, replaced DSSA Management Inc., Mr. Samuelson's management company, and assumed responsibility for management on May 21, 2004. Reilly Mortgage instituted an action in the local circuit court for the appointment of a receiver and for the foreclosure of South Pointe. In July 2004, South Pointe was placed under court ordered receivership, and Reilly assigned the mortgage to HUD, which eventually sold the mortgage at auction to a private party in 2005.

## DISCUSSION

This opinion, *Englewood V*, focuses on plaintiff's damages claims stemming from HUD's previously found breach of contract. Plaintiff has requested two types of relief: an award of damages for the revenue lost when the government breached the HAP contract, as well as an award of damages for equity lost when plaintiff defaulted on its mortgage and ceased to own South Pointe.

▪ A basic principle of contract damages is that the non-breaching party is enti-

tled to be restored to the position it would have been in had the contract been performed, but that damages should not put a party in a better position than if the contract had not been breached. *See Bluebonnet Sav. Bank, FSB v. United States*, 339 F.3d 1341, 1345 (Fed.Cir.2003). Moreover, to derive the proper amount for an award of damages, the costs resulting from the breach must be reduced by any costs that the plaintiff would have incurred absent the breach. *Id.*

▪ Damages for lost profits from a breach of contract are recoverable if the plaintiff can "establish by a preponderance of the evidence that (1) the lost profits were reasonably foreseeable or actually foreseen by the breaching party at the time of contracting; (2) the loss of profits was caused by the breach; and (3) the amount of the lost profits has been established with reasonable certainty." *Anchor Sav. Bank, FSB v. United States*, 597 F.3d 1356, 1361 (Fed.Cir.2010) (citing *Cal. Fed. Bank v. United States*, 395 F.3d 1263, 1267 (Fed.Cir.), *cert. denied*, 546 U.S. 817, 126 S.Ct. 344, 163 L.Ed.2d 55 (2005)); *see also Energy Capital Corp. v. United States*, 302 F.3d 1314, 1325 (Fed.Cir. 2002).

*HAP Contract Damages*

▪ The parties disagree as to whether HAP contract damages were reasonably foreseeable at the time of contracting. A " '[l]oss may be foreseeable as a probable result of a breach because it follows from the breach (a) in the ordinary course of events, or (b) as a result of special circumstances, beyond the ordinary course of events, that the party in breach had reason to know.' " *Franconia Assocs. v. United States*, 61 Fed. Cl. 718, 751 (2004) (quoting *Restatement (Second) of Contracts* § 351(2) (1981)); *see also Anchor Sav. Bank v. United States*, 597 F.3d at 1364–65. Foreseeability requires only "reason to foresee," it does not require actual foresight. *Anchor Sav. Bank, FSB v. United States*, 59 Fed.Cl. 126, 146 (2003), *recons. denied*, 63 Fed.Cl. 6 (2004) (quoting 11 Arthur Corbin, *Corbin on Contracts* § 1009 at 66 (Interim ed.1964)). The defendant need not have been contemplating the plaintiff's particular injury when it breached

the contract. *Id.* "Expectation damages are recoverable provided they are actually foreseen, or reasonably foreseeable, are caused by breach of the promisor, and are proved with reasonable certainty." *Bluebonnet Sav. Bank v. United States,* 266 F.3d 1348, 1355 (Fed.Cir.2001) (citing *Restatement (Second) of Contracts* §§ 347, 351, 352 (1981)). Otherwise stated, plaintiff must prove that "the general magnitude and type of damages were foreseeable." *Franconia Assocs. v. United States,* 61 Fed.Cl. at 751 (citing *Landmark Land Co., Inc. v. F.D.I.C.,* 256 F.3d 1365, 1378 (Fed.Cir.), *reh'g and reh'g en banc denied* (Fed.Cir.2001) and *N. Helex Co. v. United States,* 207 Ct.Cl. 862, 524 F.2d 707, 714 (1975), *cert. denied,* 429 U.S. 866, 97 S.Ct. 176, 50 L.Ed.2d 146 (1976)).

Plaintiff argues that since it was clear that South Pointe needed HAP payments to survive, it was reasonably foreseeable that an early, improper termination of the HAP contract would result in financial losses for Englewood. During the trial, Freddie Batchelor, a HUD employee who worked in the HUD Departmental Enforcement Center, and who worked with the Chicago HUD office on South Pointe studying its financial statements, testified that there was no way South Pointe could have successfully gone forward without the cash provided by a HAP contract. An unsigned memorandum (written by John Schneider, a multifamily appraiser at HUD) states that "... ongoing apartment rehabilitation activity in the vicinity of [South Pointe] ... still depends on attracting Section 8 certificate holders for tenants.... [E]xperience strongly suggests that South Pointe Terrace will not be able to survive, in a market sense, without deep-subsidy assistance." Ms. Batchelor clarified at trial that the phrase "deep subsidy assistance" referred to the HAP subsidy. Mr. Hayes, the previous owner and manager of South Pointe also confirmed at trial that South Pointe needed deep subsidy assistance to continue. Moreover, Mr. Hinsberger, the Director of HUD's Chicago Office, wrote to Mr. Hayes in an October 1, 2001 email (quoting his earlier email from January 23, 2001): "'The only reason [HUD has] continued to pay subsidy is to protect the tenants. Abating the contracts would stop the bulk of project revenue which would result in bills being unpaid and tenants would suffer by not having normal routine maintenance services.'"

■ Defendant contends, however, that damages could not have been foreseeable to HUD because Englewood was struggling, even while HUD was making all the required HAP payments. The government claims that since Englewood is not entitled to be placed in a better place than it would have been in otherwise, and since Englewood would have lost South Pointe in 2002 when it defaulted on the mortgage, the plaintiff is not entitled now to any HAP contract damages for a building it might not have owned regardless of the HAP contract termination. Defendant bases this argument on the fact that, before 2002, Englewood was paying over $600,000.00 per year in principal and interest payments on its CIC loan and it had lost money consistently, even in the years in which it received payments from the HAP contract.

Defendant's argument, however, seems to support plaintiff's argument. That is, if Englewood was having difficulty, even while it was receiving HAP payments, then it should have been foreseeable to the defendant that Englewood would not be able to survive without them. At the time of the breach, the HAP payments made up more than 88% of Englewood's revenue at South Pointe. HUD cannot escape its obligation under the HAP contract by arguing that a later, separate event (the loan foreclosure), which involved action by a third party, should prevent the plaintiff from being able to recover the HAP payments after HUD's breach. Moreover, it would have been irresponsible for HUD to have entered into what was essentially a four year contract, if it expected the other party would become insolvent in less than two years. Presumably, when HUD entered into the HAP contract with the plaintiff, HUD projected that it would be responsible for HAP payments for the full term of the contract. Therefore, the court finds that it was reasonably foreseeable to the defendant that by breaching the HAP contract, it would cause plaintiff to lose money it otherwise

would have earned with the HAP contract in place.

 Plaintiff next must prove by a preponderance of evidence that the contract breach was the cause of the loss of profits. *See Energy Capital Corp. v. United States,* 302 F.3d at 1324–25. The United States Court of Appeals for the Federal Circuit "has advised that lost profits are a 'just and proper item of damages to be recovered against the delinquent party upon a breach of the agreement ... if the profits are such as would have accrued and grown out of the contract itself, as the direct and immediate results of its fulfillment.'" *Franconia Assocs. v. United States,* 61 Fed.Cl. at 747 (quoting *Energy Capital Corp. v. United States,* 302 F.3d at 1328). The Federal Circuit employs one of two tests in order to determine causation: either the "substantial factor" or the "but for" causation test. The latter is considered the stricter test, as it requires the breaching party to be liable for damages that but for its breach would not have occurred, while the former only requires that the breach be a substantial factor in the damages that resulted. *Citizens Fed. Bank v. United States,* 474 F.3d 1314, 1318 (Fed.Cir.2007). In *Citizens Federal,* the United States Court of Appeals for the Federal Circuit noted that the substantial factor test is typically used when the lost profits claimed arose directly from a breach of a contract with the United States, and not under contracts with other parties. *Id.* at 1318–19. Since the loss of profits in plaintiff's case did arise directly from the government's breach of a contract, this court will employ the substantial factor test in determining whether to award HAP contract damages. The Federal Circuit has indicated that selection between the two causation standards "depends upon the facts of the particular case and lies largely within the trial court's discretion." *Id.* at 1318.

Defendant contests the assertion that the breach of the HAP contract was the cause of Englewood's damages. The government argues that Englewood lost revenue from South Pointe not because of HUD's contract breach, but mainly because of management's own decisions and the fact that CHAC had decided to "redline Englewood."[5] Defendant also asserts that since Englewood used CHAC vouchers to remove undesirable tenants from South Pointe, HUD should not have to compensate Englewood for employing a policy which reduced the number of tenants. In addition, the government argues that because Englewood consumed its HUD-insured loan "extremely quickly," and "never attempted to provide an adequate explanation for why," Englewood should not recover.

Plaintiff maintains that the breach of the HAP contract clearly caused its loss of profits under either causation test. According to plaintiff, before the termination of the HAP contract and HUD's issuance of vouchers, South Pointe had at least a 97% occupancy rate and HAP payments made up 88% of Englewood's rental income for South Pointe. By the time HUD had issued vouchers to all eligible tenants, South Pointe's occupancy rate was only 35%, while the operating costs remained constant. Moreover, the change in CHAC policy relied on in the government's argument would have been immaterial if plaintiff had continued to operate under the HAP contract, as there would have been no need to fill South Pointe with voucher tenants.

 In *Franconia Associates,* the trial court wrote that, "plaintiffs need not show that each dollar claimed was entirely unaffected by outside events." *Franconia Assocs. v. United States,* 61 Fed.Cl. at 750. The record reflects that Englewood underwent severe financial problems as a result of defendant's breach of the HAP contract. The defendant's arguments do not challenge the fact that the government's breach of the HAP contract forced Englewood into a situation requiring it to make difficult management decisions. The defendant's response seems to attack Englewood's mitigation efforts after the breach and not the issue of causation. A party that breaches a contract must not conflate mitigation and causation arguments, although failure to avoid a loss

5. According to Mr. Samuelson, the Chicago Housing Authority took the position that Englewood had a poor reputation and would not be a desirable community for voucher relocations. This exacerbated Englewood's problems in recruiting new voucher tenants.

may bar recovery. *Id.* "The rule of mitigation of damages may not be invoked by a contract breaker as a basis for hypercritical examination of the conduct of the injured party, or merely for the purpose of showing that the injured person might have taken steps which seemed wiser or would have been more advantageous to the defaulter." *Cuyahoga Metro. Hous. Auth. v. United States,* 65 Fed.Cl. 534, 546–47 (2005) (quoting *In re Kellett Aircraft Corp.,* 186 F.2d 197, 198–99 (3d Cir.1950)). The government put Englewood in a position as a result of which it would have to rely on CHAC vouchers to fill vacancies, and it should not now be able to use CHAC as a reason why Englewood should not be able to recover. This court previously found that HUD breached its HAP contract with the plaintiff, and based on the record, the government is unconvincing in its attempts to criticize Englewood's after-the-fact management decisions as a response to Englewood's request for damages.

This court also is not swayed by defendant's arguments that Englewood attempted to use vouchers to relocate problematic tenants. The record reflects that South Pointe suffered from serious drug and gang problems, and although choosing to relocate problem tenants may have lowered occupancy rates in the short run, it is not difficult to conclude that Englewood was attempting to improve South Pointe and thereby attract more tenants in the long run. Mr. Hayes also testified at trial that operating costs as a result of destruction of property would decrease if tenant screening improved at South Pointe. Furthermore, the speed at which Englewood spent the loan also can be explained considering that in December 2002, when the loan was issued, Englewood had been operating at approximately 30% occupancy for three months, causing Englewood to run up large deficits to keep the building habitable.

The loss of the HAP contract was a "substantial factor" which caused South Pointe's vacancy rates to increase rapidly and dramatically, and, therefore, caused plaintiff to lose a significant amount of revenue. Even under the more stringent "but-for" causation test, this court finds that the government's breach caused Englewood to lose the payments guaranteed by the contract.

On the issue of mitigation, the rule is that plaintiff cannot recover for a loss that could have been avoided with reasonable efforts. When mitigating damages from a breach, plaintiff only is required to make efforts that are "fair and reasonable under the circumstances." *Home Sav. of Am. v. United States,* 399 F.3d 1341, 1353 (Fed.Cir. 2005) (citing *Robinson v. United States,* 305 F.3d 1330, 1333 (Fed.Cir.2002)); Recovery is not precluded even if the reasonable efforts are unsuccessful. *See also Globe Sav. Bank, FSB v. United States,* 65 Fed.Cl. 330, 348 (2005), *aff'd in part, vacated in part, remanded,* 189 Fed.Appx. 964 (Fed.Cir.), *reh'g denied* (Fed.Cir.2006). Once the plaintiff has made its case, the burden shifts to the breaching party to show that the efforts at mitigation were unreasonable. *Id.*

After the termination of the HAP contract, Englewood made efforts to keep and recruit lease compliant tenants, while attempting to remove noncompliant, undesirable tenants from the building. Mr. Samuelson testified at trial that Englewood convinced eighty tenants to use their vouchers at South Pointe. This number is significant given that, according to the record, when tenants were interviewed in the fall of 2001, it was thought that only 5% would elect to use their vouchers at South Pointe. In 2003, Englewood started a comprehensive marketing program with advertisements, brochures and additional services for residents. Englewood's staff also went to CHAC every day and attempted to recruit tenants who were receiving vouchers and were thought to be good tenants. Unfortunately, these efforts only moved South Pointe up to 40% capacity. Moreover, defendant does not present a direct argument that Englewood's mitigation strategies were unreasonable. As noted above, plaintiff should not be precluded from recovery if it made reasonable, although unsuccessful efforts, to avoid loss. *See Globe Sav. Bank, FSB v. United States,* 65 Fed.Cl. at 348 (quoting *Restatement (Second) of Contracts,* § 350(2) (1981)). Therefore, the court finds that Englewood's attempts at mitiga-

tion, while ultimately unsuccessful, were not unreasonable.

■ Finally, damages must be shown with reasonable certainty, although not with absolute mathematical preciseness. *Bluebonnet Sav. Bank, FSB v. United States*, 266 F.3d at 1355. ("The ascertainment of damages is not an exact science, and where responsibility for damage is clear, it is not essential that the amount thereof be ascertainable with absolute exactness or mathematical precision." (quoting *Elec. & Missile Facilities, Inc. v. United States*, 189 Ct.Cl. 237, 416 F.2d 1345, 1358 (1969))). The parties disagree on the amount plaintiff should be allowed to recover, specifically, whether the plaintiff put forward sufficient evidence at trial regarding the amount of potential revenue, the actual date of the breach of the HAP contract, the correct vacancy rate which should be used in the damage calculation, how expenses factor into the damages award, and whether the section 221(d)(4) HUD-insured loan put plaintiff in a better position than it was in before the HAP contract was breached.

The government questions whether the plaintiff is entitled to damages at all since the court did not grant it a budget based or an Operating Cost Adjustment Factor (OCAF) rent increase. *See Englewood III*, 84 Fed. Cl. 649; *Englewood IV*, 86 Fed.Cl. 720. At trial, plaintiff believed it was entitled to a rent increase for all South Pointe units beginning in October 2001. Plaintiff's exhibits in the record calculate damages with an OCAF rent increase included. Plaintiff did not present an exhibit in the alternative as to the amount of rent to which plaintiff would be entitled if the court did not agree with plaintiff that an OCAF rent adjustment should have been granted. The government argues this should bar plaintiff from recovering.

During his damages testimony, Mr. Samuelson indicated that the damage amount easily could be recalculated if the court did not find that plaintiff was entitled to a rent increase. This could be achieved by substituting in the amount Englewood would have been due under the original terms of the 2000 HAP contract (in other words, the rental revenue before the assumed OCAF increase) for the amounts currently in the exhibit. The 2000 HAP contract is contained in the record and the court agrees that it can be used to compute the total potential HAP payments for any given month. From the HAP contract, this court can calculate that the potential rent revenue for each month, at 100% occupancy, is $223,439.00.[6] Therefore, plaintiff's exhibits provide a framework from which this court can derive a methodology for a damages calculation. The court finds that even though the damages spreadsheets in the record assumed that Englewood was entitled to a rent increase when it was not, the plaintiff can recover by using the rents that were due under the original contract.

■ The parties also dispute the specific date the contract was breached. This date is necessary to determine damages with reasonable foreseeability because " '[t]he time when performance should have taken place is the time as of which damages are measured.' " *Energy Capital Corp. v. United States*, 302 F.3d at 1330 (quoting *Reynolds v. United States*, 141 Ct.Cl. 211, 220, 158 F.Supp. 719, 725 (1958)). Due to the complex fact pattern, the varying versions of the history of this case, and the disorganized record, determining an exact date of breach is not entirely straightforward.

Plaintiff submits October 1, 2001 as the date when breach actually occurred. On this day, Mr. Hinsberger sent an email to Mr. Samuelson and Mr. Hayes informing them that vouchers would start to issue on that day and that once all the vouchers had been

---

6. The HAP contract provides the following information: sixty one bedroom units at $648.00; seventeen two bedroom units at $799.00; 140 two bedroom units at $727.00; six three bedroom units at $866.00; and eighty three bedroom units at $800.00.

| Number of Units | Number of Bedrooms | Contract Rent ($) | Total Monthly Rent ($) |
|---|---|---|---|
| 60 | 1 | 648 | 38,880 |
| 17 | 2 | 799 | 13,583 |
| 140 | 2 | 727 | 101,780 |
| 6 | 3 | 866 | 5,196 |
| 80 | 3 | 800 | 64,000 |
| | | | **223,439** |

issued, the HAP contract would be terminated. The government, through Mr. Hinsberger, testified at trial that vouchers had in fact not begun to issue until June of 2002, although this date is contradicted by an email in the record from CHAC to a HUD employee indicating that all the vouchers had been issued by June 10, 2002. As stated previously, the HAP contract was phased out in stages. When a tenant used his or her voucher to leave or move out for any other reason, Englewood stopped receiving HAP payments for that unit. Although Englewood cites to several internal HUD emails that suggest vouchers began to issue in late fall of 2001, plaintiff was unable to cite to any exhibit in the record which would reliably inform this court of the specific date on which the vouchers began to issue. Moreover, as plaintiff himself points out, the issuing of vouchers is a complicated, multi-step process, and just because a tenant received a voucher did not mean it was immediately used.

Therefore, although vouchers may have started to issue in the winter of 2001–2002, the lack of a primary source document in the record renders it challenging for the court to ascertain the point at which plaintiff should begin recovering damages. The starting point and amount of damages must be proved by plaintiff with reasonable certainty, and there is little information in the record beyond data points and second hand information for the winter and spring of 2002. In its response to a court order, the government agreed that July 2002, when Mr. Hinsberger stated the voucher process was complete and the vacancy rates increased dramatically, could be identified as the date on which vouchers had a substantial effect on the occupancy at Englewood. The court, therefore, accepts Mr. Hinsberger's testimony in this regard, and the defendant's acknowledged date, and finds July 1, 2002 as the date of the breach for the purposes of calculating damages.

The parties also cannot agree on what rate of vacancy at South Pointe should be assumed to calculate plaintiff's damages. Plaintiff argues that the court should use a rate of 3%. Plaintiff points out that, histori-

cally, South Pointe's vacancy rate had ranged from 1.3%–3%. Mr. Schneider, a HUD employee, wrote in 2002 that the project occupancy had averaged 97.7% for the three previous years when Englewood had received the benefits of a HAP contract.

The HUD-insured, section 221(d)(4) loan Englewood took out, however, complicates the matter. When CIC foreclosed on Englewood, plaintiff used a HUD-insured loan to pay off the CIC mortgage. The HUD-insured loan was given under section 221(d)(4) of the National Housing Act, codified at 12 U.S.C. § 1715l (2006). The loan was insured on a condition that Englewood perform substantial rehabilitation and required plaintiff to return South Pointe to a "like new" condition. Plaintiff explained at trial that during construction, two to three floors of South Pointe could not be inhabited while the substantial renovations were taking place. Even with the HAP contract, Englewood could not have received payments for apartments that were not occupied due to construction. If plaintiff had not taken the section 221(d)(4) loan, the property would have been lost. And, due to the loss of the HAP contract, Englewood could not have signed a loan with another lender.

Englewood also contends that the loan required repairs above and beyond what was required by the HAP contract (a point with which this court agreed in its liability opinion, see *Englewood II,* 79 Fed.Cl. at 544), and that the REAC repairs required by the HAP contract could have been completed without evacuating tenants. Furthermore, plaintiff claims that because HUD unilaterally amended the four year HAP contract in the second month by terminating the automatic renewal periods and switching to a series of less than one year terms, it rendered plaintiff incapable of refinancing its CIC loan. If HUD had not breached its contract, Englewood now maintains that it could have sought refinancing from a variety of lenders, would not have been forced into the HUD-insured loan and would not have had to keep two to three floors of its building unoccupied while making repairs. Defendant points out that construction on two floors of South Pointe, necessitated by the terms of the loan, would

have occasioned at least a 9.4% vacancy. Defendant argues that because plaintiff does not acknowledge this fact in its briefing, it adds even more uncertainty to plaintiff's damages argument, since Englewood could not have received payments for at least two floors of South Pointe while they were under construction.

The record reflects Englewood had been attempting to obtain a section 221(d)(4) loan insured by HUD for the purpose of performing substantial rehabilitation since 1999. In fact, it had asked HUD to insure a section 221(d)(4) multimillion dollar loan for rehabilitation in 1999, twice in 2001, and again in 2002. Englewood, however, offered no specific evidence to demonstrate it had spoken to any other lenders about alternative types of loans. Therefore, plaintiff has failed to prove it had any intention of taking out a different loan if given the opportunity. Since plaintiff has the burden of proof, this court finds that while the 97% rate of occupancy argued for by plaintiff was appropriate before plaintiff began substantial rehabilitation on South Pointe, from December 2002 (the month the loan was finalized) until the end of the contract, it should be assumed that two floors remained unoccupied (9.5% vacancy or 90.5% occupancy) for the purpose of calculating damages.[7]

Defendant states that since damages should not place the nonbreaching party in a better position than it would have been in had there been no breach, *Bluebonnet Sav. Bank, FSB v. United States*, 339 F.3d at 1345, plaintiff's damages should be offset by the amount plaintiff borrowed and never repaid from the Illinois Housing Development Authority (IHDA), as well as the mortgage payments it was allowed to forego on the HUD-insured loan in 2003–2004. Defendant argues that lost revenue calculations performed by the court must include deductions for expenses that the recovering party would have incurred. According to the government, the expenses which must be deducted include the money borrowed from IHDA, plus interest; the HUD-insured mortgage for 2003–2004; the liability insurance that Englewood did not pay in December 2003; the property taxes it missed in February 2004; and the amounts of money it would have needed to complete the rehabilitation. Englewood responds that a plaintiff's financial obligations to third party lenders, investors, or vendors should not be used by HUD to offset HAP contract damages. Plaintiff also argues that HAP payments are required to be made even in cases of foreclosure or other actions against the owner. Finally, Englewood asserts that since it is only asking for lost revenue it would have received if the government had not terminated the HAP contract without cause, expenses should not be a relevant factor in the calculation.

The United States Court of Appeals for the Federal Circuit has held that the proper amount for damages should be determined by taking the costs resulting from the breach and reducing them by any costs the plaintiff would have experienced absent a breach. *Bluebonnet Sav. Bank, FSB v. United States*, 339 F.3d at 1345. It is important to note that in its HAP contract damages claim Englewood is not asking the government to reimburse it for costs it incurred due to the breach, it is only asking for the HAP revenue it lost. From the record it is evident that Englewood had to pay additional costs out of pocket due to the breach of the HAP contract, although it had stopped receiving management fees. Expenses due to the breach appear to have been greater than those that would have been incurred absent the breach. Defendant is liable for damages it caused to plaintiff when it breached the HAP contract and cannot now avoid that obligation because plaintiff did not make payments to other third parties, arguably as a result of the lack of a HAP contract. As this award of HAP contract damages will not place plaintiff in a better position than it would have been without the breach, this court does not believe plaintiff's failure to deduct those expenses listed by the government should prevent plaintiff from recovery.

7. South Pointe had twenty-one floors of units: twenty floors of apartments and one level of two-story townhouses. Nineteen floors occupied out of twenty-one equals 90.5% occupancy (19/21 = .9048).

The government also maintains that the only reason Englewood sought a four year HAP contract was to refinance its loans and to do major renovations, and that because HUD gave plaintiff a loan even after it lost the HAP contract, plaintiff was placed in the same if not a better position. Under this theory, the government argues that if the plaintiff is entitled to any damages, the court should limit them to $864,466.00, the lost revenue calculated in Englewood's brief beginning in October 2001 through December 2002, the month the loan was finalized.

There is nothing in the record to demonstrate that Englewood would seek a HAP contract solely because it wanted to obtain a loan, and did not also desire a HAP contract for its inherent monetary value. Moreover, although HUD insured the section 221(d)(4) loan, the loans were made with third parties. This court has already held that the 2002 loan · was a separate issue from the HAP contract with respect to the level of rehabilitation. *Englewood II*, 79 Fed.Cl. at 547. This court concludes that taking out the $11.6 million loan which Englewood used to rehabilitate South Pointe, a property which it eventually lost due to foreclosure of this same loan, did not place Englewood in a better position than it would have been with the continuation of the HAP contract.

The government also claims that Mr. Samuelson was not competent to provide the court with expert evidence since he was a lay, fact witness at trial and that, therefore, his testimony on damages, including hypothetical projections, such as Englewood's lost revenue, cannot be valid. Rule 701 of the Federal Rules of Evidence (FRE) limits a non-expert witness' testimony to opinions or inferences "not based on scientific, technical, or other specialized knowledge...." Fed. R.Evid. 701 (2010). A recognized exception to FRE 701, however, is that if a lay witness is the owner or officer of a business, he may testify to the value or projected profits of the business, without the necessity of qualifying as an accountant, appraiser, or similar expert. Fed.R.Evid. 701 Advisory Commit tee Notes ¶ 4 (Dec.2000). The Advisory Commit tee Notes to the Rules of Evidence explain that this evidence is "admitted not because of

experience, training or specialized knowledge within the realm of an expert, but because of the particularized knowledge that the witness has by virtue of his or her position in the business." *Id.*; *see also Lightning Lube, Inc. v. Witco Corp.*, 4 F.3d 1153, 1175 (3d Cir.1993); *DataMill, Inc. v. United States*, 91 Fed.Cl. 722, 736 (2010) ("Where the testimony is based upon personal knowledge of the facts underlying the opinion and the opinion is rationally related to the facts, a lay witness may, 'under certain circumstances [,] express an opinion even on matters appropriate for expert testimony.'" (citing *Soden v. Freightliner Corp.*, 714 F.2d 498, 511 (5th Cir.1983))).

 Defendant's attempts to distinguish Mr. Samuelson as an owner who does not fall into this exception are unconvincing. Defendant cites a number of cases including, for example, *United States v. Riddle*, for the proposition that a lay witness cannot offer opinions about events that he did not contemporaneously observe or to project what a witness would have done under different circumstances. The lay witness in that case, however, was a bank examiner. He had never been a bank employee, but was an employee of the Office of the Comptroller of the Currency who had examined the bank in only a fraction of the years that were at issue at trial. *United States v. Riddle*, 103 F.3d 423, 427 (5th Cir.1997). Neither *Riddle*, nor the other cases cited, assist defendant. The court will allow Mr. Samuelson's testimony, because he had relevant, personal, in-depth, involvement in the business of managing South Pointe since December 2001. Moreover, his management company was the sole member of Englewood Terrace Limited Partnership starting in December of 2002. Mr. Samuelson had enough "particularized knowledge ... by virtue of his ... position in the business" so that he should be allowed to testify regarding future damages that would have been incurred as a result of the breach of the HAP contract. *See* Fed.R.Evid. 701 Advisory Commit tee Notes ¶ 4 (Dec.2000).

It is the conclusion of this court that Englewood can recover damages due to the breach of the HAP contract. The plaintiff is entitled to recover damages starting on July

1, 2002, through the end of the contract on September 30, 2004. The occupancy rate of South Pointe is assumed to be 97% for the first five months and 90.5% for the remaining twenty-two months. In order to calculate damages, Plaintiff's Exhibit 3A at 4249B in the record will be used to reach a dollar amount. The values in the Potential Revenue column are changed to the following: the potential revenue for the months of October 2001—June 2002 is $0, as the court has held that plaintiff cannot begin to recover until July 2002; the potential revenue for July 2002—November 2002 is $216,736.00 [8]; the potential revenue for December 2002—September 2004 is $202,212.00.[9] As in the chart, the Lost Revenue (the Potential Revenue less the Actual Revenue received) is the amount plaintiff is allowed to recover in damages. The court notes that defendant did not contest the Actual Revenue values. In addition, since plaintiff submitted no argument to this court regarding the proper discount rate to be used, and did not address it in its original complaint, this court will grant plaintiff only the amounts requested and will not recalculate the final value to reflect changes in inflation.

*Lost Equity Damages*

 In order to recover damages for lost equity, plaintiff must meet the same test as that set out above for recovery of damages for breach of the HAP contract. Plaintiff must "establish by a preponderance of the evidence that (1) the lost profits were reasonably foreseeable or actually foreseen by the breaching party at the time of contracting; (2) the loss of profits was caused by the breach; and (3) the amount of the lost profits has been established with reasonable certainty." *Anchor Sav. Bank, FSB v. United States*, 597 F.3d at 1361 (citing *Cal. Fed. Bank v. United States*, 395 F.3d at 1267).

Plaintiff argues that lost equity damages are recoverable when a subsidized housing contract is breached, including the value of the buildings lost due to a loan foreclosure caused by that breach. The plaintiff states:

"the housing authority was liable for 'consequential damages'—the loss of equity due to the lender's foreclosure—because the housing authority 'knew that the cash flow expected to be generated by [the housing authority's] rental payments would be the sole source of the funds to pay off the [building's owner's] mortgage obligations.'" (quoting from *Markowitz & Co. v. Toledo Metro. Hous. Auth.*, 608 F.2d 699, 707 (6th Cir. 1979)) (brackets in plaintiff's brief). Englewood argues that by applying the *Markowitz* reasoning to its case, the court should allow recovery for lost equity damages.

The government argues that Englewood's situation can be distinguished from that in *Markowitz*. The lender in *Markowitz* only agreed to lend plaintiff the funds based on Letters of Intent signed by the Toledo Metropolitan Housing Authority (TMHA), which promised that TMHA would lease the property for twenty years. When it seemed that TMHA would not abide by these Letters of Intent, the bank stopped providing the plaintiff with funds. *Id.* at 703. In Englewood's case, however, the second loan was made with the knowledge that Englewood did not have a HAP contract and was not likely to receive one in the foreseeable future. Therefore, Englewood cannot contend that the loan which caused the loss of equity in the property was made by relying on the HAP contract.

 Defendant also argues that plaintiff's reliance on *Markowitz* constitutes a fatal concession, as the damages given by that court were deemed to be "consequential damages." Consequential damages are those that "do not flow directly and immediately from an injurious act but that result indirectly from the act." *Black's Law Dictionary* 416 (8th ed.2004). The United States Court of Appeals for the Federal Circuit has held that "'Remote and consequential damages are not recoverable in a common-law suit for breach of contract ... especially ... in suits against the United States for the recovery of common law damages, such as the instant case.'" *San Carlos Irrigation and Drainage*

---

**8.** Total Potential Revenue multiplied by the pre-loan occupancy rate ($223,439.00 × .97 = $216,736.00).

**9.** Total Potential Revenue multiplied by the loan occupancy rate ($223,439.00 × .905 = $202,212.00).

*Dist. v. United States,* 111 F.3d 1557, 1563 (Fed.Cir.), *reh'g denied* (Fed.Cir.1997) (quoting *Wells Fargo Bank, N.A. v. United States,* 88 F.3d 1012, 1020 (Fed.Cir.), *cert. denied,* 520 U.S. 1116, 117 S.Ct. 1245, 137 L.Ed.2d 328 (1996) (quoting *N. Helex Co. v. United States,* 207 Ct.Cl. 862, 524 F.2d at 713, 720)) (omissions in original). These types of damages become too remote and speculative, and therefore, should not be allowed. *See, e.g., Energy Capital Corp. v. United States,* 302 F.3d at 1328 ("'But if [the profits] are such as would have been realized by the party from other independent and collateral undertakings, although entered into in consequence and on the faith of the principal contract, then they are too uncertain and remote to be taken into consideration as a part of the damages occasioned by the breach of the contract in suit.'" (quoting *Wells Fargo Bank, N.A. v. United States,* 88 F.3d at 1023)(quoting *Ramsey v. United States* 121 Ct.Cl. 426, 101 F.Supp. 353, 358 (1951), *cert. denied,* 343 U.S. 977, 72 S.Ct. 1072, 96 L.Ed. 1369 (1952))); *Smith v. United States,* 34 Fed.Cl. 313, 326 (1995), *appeal dismissed,* 91 F.3d 165 (Fed.Cir.1996) ("A ripple effect claim compensates a contractor for damages caused to one or more contracts as the result of the impact from actions relating to an entirely different contract.... Such damages are usually considered to be too remote or too speculative and subject to the rule that consequential damages are not recoverable under government contracts.").

▮▮ The test of reasonable foreseeability for lost equity following termination of the HAP contract is the same as the one applied above in the HAP contract damages section. It is important to note that even if some type of loss was foreseeable, or even some loss of the same general type was foreseeable, it is not enough to meet the burden of proof if the loss that actually occurred was not foreseeable. *Franconia Assocs. v. United States,* 61 Fed.Cl. at 746, 751 (citing *Restatement (Second) of Contracts* § 351 cmt. a (1981)). Plaintiff argues that HUD should have foreseen that the termination of the HAP pay-

ments would result in CIC foreclosing on Englewood. Plaintiff contends that "it was foreseeable in 2000 that the abatement or suspension of the HAP subsidy would reduce Englewood's rent revenue to a level that it would default on its CIC mortgage in 2002 and face foreclosure [.] The CIC foreclosure action would then oblige Englewood to pursue refinancing alternatives as an effort to mitigate the damages resulting the loss [sic] of its equity." In addition, plaintiff asserts that because "CIC withdrew its foreclosure action *on the condition* that Englewood would proceed with the HUD loan," the two actions are related (emphasis in original). Further complicating the foreseeability issue is the fact that Englewood did not lose the property when CIC foreclosed, but rather over two years later, in May 2004, when Englewood defaulted on the HUD-insured, section 221(d)(4) loan, which plaintiff had used to buy its way out of the CIC foreclosure.[10]

▮▮ Although shouldering the burden of proof, Englewood presented very little evidence during the trial regarding the foreseeability of a potential loss of equity. *See Anchor Sav. Bank v. United States,* 597 F.3d at 1361 ("[P]laintiff must establish by a preponderance of the evidence that ... the lost profits were reasonably foreseeable or actually foreseen by the breaching party at the time of contracting...."). Although several HUD employees testified that Englewood was dependent upon HAP payments to operate the building, no one from HUD testified on whether the HAP contract was essential for Englewood to hold on to the building. Plaintiff argues that this court can draw an adverse inference against HUD due to the fact that it did not present evidence regarding lost equity from several witnesses who testified about other matters at the trial. The court, however, agrees with the government's statement that it is "not obligated to produce witnesses to prove up Englewood's case or support Englewood's burden of proof." Moreover, there were many pretrial,

10. The court notes that the history of the section 221(d)(4) loan is complex. DSSA notified Reilly Mortgage in May 2004 that it would be leaving the property. The court appointed a receiver on July 15, 2004, and HUD eventually sold the mortgage to a private party which finally filed for the foreclosure of South Pointe in 2005.

scheduling conferences in this case, in which the parties often disagreed, both on and off the record, to determine the list of witnesses each party would put on the stand at trial. Both parties were well aware that any witness was available for cross-designation as a witness for the other side if offered by one party and considered essential for the other party's case. "An unfavorable inference may not be drawn from the lack of testimony by one who is equally available to be called by either party." *A.B. Dick Co. v. Burroughs Corp.*, 798 F.2d 1392, 1400 n. 9 (Fed.Cir.1986) (citing *Johnson v. Richardson*, 701 F.2d 753, 757 (8th Cir.1983)).[11] Therefore, plaintiff could have listed as a witness and called Mary Anderson, the HUD Director of Operations with the Chicago Multifamily Housing office, as well as other HUD employees, to present its case, but chose not to do so. Once the defendant limited the scope of the direct, and plaintiff had not listed the witness, plaintiff's questioning on its cross-examination was limited. This court, therefore, will not now draw an "adverse inference" to compensate for Englewood's own choices and litigation strategy.

Englewood also tries to prove foreseeability by arguing that because CIC required a multiyear HAP contract to provide security for an additional refinancing and rehabilitation loan for South Pointe, that, therefore, HUD should have foreseen Englewood's default on the second, HUD-insured loan. Both Englewood and HUD entered into the second loan with the knowledge that Englewood no longer had a HAP contract. The court will not draw the illogical conclusion that HUD foresaw Englewood's default on the section 221(d)(4) loan as a result of a contract it had already terminated and had no intention to reinstate. Presumably HUD would not have proceeded to insure the loan if it predicted ultimate failure. For all the above reasons, the court concludes that the plaintiff has failed to meet its burden of proof by not presenting sufficient evidence to show that HUD foresaw or should have foreseen that if it terminated the HAP contract, En-

glewood would eventually lose its equity in South Pointe.

■ Even if plaintiff had succeeded in showing that its loss of equity was reasonably foreseeable to HUD, it would still have had to meet the burden of proof for causation by showing that the breach was a proximate cause of the equity loss. As addressed above, the court must choose between the "substantial factor" and the "but for" causation tests. Since the first loan was with CIC and not the government, and the second set of loans, while insured by HUD, were made with Reilly Mortgage and IHDA, Englewood's claim for lost equity damages falls into the category of lost profits flowing out of a contract with a third party. Therefore, it is appropriate for Englewood to show that "but for" the contract breach, it would not have lost the property. This stricter test prevents remote and speculative damages.

Plaintiff argues that although it did not lose its equity in South Pointe until the default of the HUD-insured loan in 2004, the breach of the HAP contract was still the cause of this loss. Plaintiff portrays a series of events that eventually led to Englewood's loss of equity. First, plaintiff argues that HUD's December 6, 2000 repudiation of its automatic renewal obligations left Englewood unable to refinance its CIC loan, a loan that had very high principal payments with which Englewood had been struggling for some time. Then, Englewood's inability to refinance its loan caused it to go further into debt by attempting to fund REAC repairs with rental revenue and, finally, it defaulted on the loan in January 2002 for the "technical default," in plaintiff's words, of failing to fully fund the real estate tax escrow. After advancing money to CIC to pay the property taxes, Englewood negotiated an agreement with CIC not to foreclose. Despite this, CIC foreclosed a second time in May 2002 and the withdrawal of the foreclosure was conditioned on Englewood paying off the entire debt with a HUD-insured, section 221(d)(4) loan. Finally, according to plaintiff, due to

---

11. The court notes that the employee exception to the "equally available" rule mentioned in *A.B. Dick Co.* does not apply in this case as Englewood did call HUD employees as witnesses, in-

cluding Ms. Batchelor and Mr. Hinsberger, and plaintiff was told it was permitted to call additional, HUD employees if plaintiff chose to do so.

its lack of HAP payments, Englewood would later default on this loan and thereby lose its equity in South Pointe. This is the chain of causation which Englewood asserts caused its equity loss.

Defendant argues that Englewood's efforts to construct a " 'chain of events' between the termination of the HAP contract and Englewood's loss of South Pointe through foreclosure of a post-termination mortgage three years later" are unpersuasive. The government contends Englewood failed to show that the loss of equity can be directly attributed to the breach of the HAP contract and argues that there were "numerous other methods by which Englewood was predestined to lose South Pointe, regardless of the status of the HAP contract." Defendant points out that Englewood had a negative cash flow in 1999 and 2000, and that Mr. Samuelson predicted a negative cash flow of $241,340.00 for 2001, well before the breach of the HAP contract. Moreover, Englewood had suffered little or no loss in HAP revenue in 2001, so that the record suggests that plaintiff would have undergone the same January 2002 foreclosure action even with the HAP contract fully in place.

The court finds that based on the record before the court after trial, the plaintiff is unable to meet its burden of proof on causation for lost equity damages. The record demonstrates that Englewood had been trying to refinance its CIC loan with a HUD-insured loan since 1999, but had failed to submit an acceptable application. To argue now that Englewood was forced into this loan requiring substantial rehabilitation, when Englewood had sought a section 221(d)(4) loan for substantial rehabilitation since 1999 stretches credulity. Moreover, plaintiff's version of the chain of events becomes even more tenuous when one takes into account that Englewood defaulted on the first loan in January of 2002 while still receiving almost all of the HAP payments. Although HUD had notified Englewood by that time that it would be terminating the HAP contract, in actuality, there had been little change in the amount of HAP payments. In fact, Englewood only had 5% vacancy in January 2002.

The court agrees with the government when it argues that the plaintiff's attempts to connect the foreclosure of the second loan to the breach of the HAP contract are far too speculative. When it entered into the second loan, plaintiff knew that the HAP contract had been terminated and also had no reason to believe that it would be reinstated. Plaintiff presents a long, complicated chain of causation which does not rise to a preponderance of the evidence under either the "but for" or the "substantial factor" tests of causation. Plaintiff's arguments are undermined by Englewood's continuous financial problems before the loss of the HAP payments and the fact that the foreclosure occurred before the effects of the termination had begun to set in. Therefore, plaintiff has failed to meet its burden with respect to causation for its loss of equity claim.

■ Finally, plaintiff would still need to establish the amount of lost equity claimed with reasonable certainty. Plaintiff seems to be requesting almost $4 million in lost equity damages. To determine the value of South Pointe, plaintiff used an appraisal value prepared in March 2001 which averaged the capitalized income, the direct sales comparable and the effective gross income multiplier methods of valuation. The appraiser determined a value of $6,750,000.00. That value, less the South Pointe debt of $2,782,277.00 as of March 2001, gives an equity value of $3,967,723.00. This valuation was originally prepared for Englewood's loan application. Plaintiff acknowledges that the valuation was submitted to HUD and that HUD's reviewer believed that the estimated value determined by the capitalized income approach was "overstated and not supported." The record reflects the reviewer as stating that the annual operating expenses used to calculate this amount were far below the actual Englewood operating expenses for the previous two years (1999 and 2000). In response, plaintiff argues that the expenses in 1999 and 2000 were much higher than usual due to a substantial repair program, extraordinary energy costs, and an armed guard security system. Therefore, Englewood states it was entitled to use marketplace comparables to determine the operating expenses at South Pointe. Englewood believes it was entitled

to do this because Mr. Hayes and Carl Sanders, Englewood's area property manager, testified at trial that 1999 through 2001 were expensive years for Englewood.

The government points out that HUD never agreed that the value chosen by plaintiff was the correct appraisal value to use. In an April 3, 2001 response to Englewood's loan application, HUD questioned Englewood's "as-is value" and stated that the revised as-is appraisal value would have been $3,645,000.00, if the actual reported expenses for Englewood had been used. This is significantly less than the $6,750,000.00 figure proposed by Englewood. HUD's response also completely discounts the other two methods Englewood used to appraise South Pointe and concludes that the capitalized income approach is the most accurate of the appraisal methods. Defendant further maintains that simply because Englewood asserted that operating expenses "should be" at a particular rate, does not necessarily allow Englewood to use this rate in calculating its building's worth. The government also questions additional assumptions by Englewood in another one of the appraisal methods. Defendant does not believe that plaintiff's use of a project one-and-a-half times smaller than South Pointe is a valid equivalent to use in the direct sales comparable appraisal method.

There is far too much ambiguity in plaintiff's case to establish plaintiff's lost equity damages "with reasonable certainty." This is aggravated by the fact that plaintiff has included very little support in the record regarding lost equity damages. So while this court does not anticipate that plaintiff could establish these damages with a sufficient degree of definiteness, it certainly has not done so, although afforded multiple opportunities to do so at trial before the record was closed.

Plaintiff has not met the burden of proof for any prong of the lost equity damages test. Englewood simply has repackaged its HAP contract damages arguments and expected this court to make the additional leap that because Englewood would suffer damage from losing the HAP contract, it would also lose its interest in the property by defaulting on a loan. This court concludes that plaintiff's claim for lost equity damages is far too remote and speculative to allow recovery.

## CONCLUSION

For the foregoing reasons, the court partially grants plaintiff's claim for relief. HAP contract damages of $3,272,217.00 are awarded to plaintiff, but plaintiff's claim for lost equity damages is, hereby, denied.

**IT IS SO ORDERED.**