**AMMEX, INC., Plaintiff,**

v.

**The UNITED STATES, Defendant.**

Nos. 99–338T, 99–778T.

United States Court of Federal Claims.

May 20, 2002.

J. William Koegel, Jr., Washington, D.C., attorney of record for plaintiff.

William K. Drew, Washington, D.C., with whom was Eileen J. O'Conner, Assistant Attorney General, for defendant.

### OPINION ON MOTION FOR RECONSIDERATION

REGINALD W. GIBSON, Senior Judge.

INTRODUCTION

This case was recently before the court on cross-motions for summary judgment raising the issue of standing.[1] Initially, through consolidated proceedings,[2] the plaintiff Ammex averred that it was entitled to a tax refund in the aggregate of $6,090,975 in federal manufacture's excise taxes that it allegedly paid to its suppliers when it purchased gasoline and diesel fuel for resale at its duty-free store in Detroit, Michigan. By its motion for summary judgment,[3] the defendant challenged plaintiff's legal standing to pursue its claim under the Export Clause and various tax statutes enumerated by plaintiff in its complaint. Shortly thereafter, plaintiff filed a cross-motion asserting that it did, in fact, possess standing and, therefore, was entitled to judgment as a matter of law.[4]

In its April 10, 2002 opinion on the foregoing motions, this court: (1) denied plaintiff's cross-motion finding that there were genuine issues of material fact for trial, and (2) granted, in part, and denied, in part, defendant's motion finding that plaintiff lacked standing to proceed in this court under the Export Clause and all but one section of the tax statutes, to wit, 26 U.S.C. § 6421. That section of the tax code where standing was established by plaintiff, however, embraces that portion of the excise taxes attributable to plaintiff's gasoline purchases, only, which represent approximately $3,302,486 of plaintiff's original claim.

The subject case is now before the court only on plaintiff's motion for reconsideration of the court's finding that it lacked standing under the Export Clause. For reasons set forth below, plaintiff's motion for reconsideration of the court's April 10, 2002 holding is denied.

MOTION FOR RECONSIDERATION

Plaintiff filed its motion for reconsideration of the court's April 10, 2002 opinion on April 24, 2002, pursuant to RCFC 59 and 83.2(f).[5]

Rule 59 provides:

(a) Grounds. (1) A new trial or rehearing or reconsideration may be granted to all or any of the parties and on all or part of the issues, for any of the reasons established by the rules of common law or equity applicable as between private parties in the courts of the United States. On a motion under this rule, the court may open the judgment if one has been entered, take additional testimony, amend findings of fact and conclusions of law or make new findings and conclusions, and direct the entry of a new judgment.

RCFC 59(a)(1).

Rule 83.2(f), Reconsideration of Orders, states that:

A motion for reconsideration of an order shall be filed not later than 10 days after the date thereof. No response may be filed to a motion for rehearing or reconsideration. However, the court will not rule

---

1. *Ammex, Inc. v. United States*, 52 Fed.Cl. 303 (2002).

2. Ammex filed a complaint for the quarterly tax periods ending June 30, 1994 through September 30, 1996, on May 29, 1999 (*Ammex, Inc. v. United States*, Fed.Cl. No. 99–338T). Thereafter, on September 23, 1999, plaintiff filed a second complaint for the quarterly tax periods ending December 31, 1996 through December 31, 1998 (*Ammex, Inc. v. United States*, Fed.Cl. No. 99–778T). The latter case was consolidated with the former case on December 2, 1999.

3. Defendant filed a motion for summary judgment on October 13, 2000.

4. Ammex followed with its cross-motion for summary judgment on December 5, 2000.

5. The Court Rules were revised effective May 1, 2002, to more closely mirror FRCP. Rule 59, "New Trials; Rehearings; Amendment of Judgments; Reconsider," in all material respects, remains unchanged. The content under Rule 83.2, "Time for Filing," now appears under new Rule 7.1. What was Rule 83.2 paragraph (f). "Reconsideration of Orders," no longer exists as a separate paragraph under the revised rules. The effectual content of former Rule 83.2(f) is found in Rule 59, paragraph (b).

in favor of such a motion without first requesting by order a response to it.

In its Order dated April 25, 2002, this court acknowledged plaintiff's timely April 24, 2002 filing of its motion for reconsideration. By said Order, defendant was directed to file a response by April 30, 2002, and plaintiff, thereafter, was to reply on or before May 3, 2002. All parties have so complied.

STANDARD OF REVIEW

 Whether to grant a motion for reconsideration is at the sound discretion of the court. *Yuba Natural Resources, Inc. v. United States*, 904 F.2d 1577, 1583 (Fed.Cir. 1990). To prevail on such motion, the movant must point to a manifest (*i.e.*, clearly apparent or obvious) error of law or a mistake of fact. *Principal Mutual Life Ins. Co. v. United States*, 29 Fed.Cl. 157, 164 (1993). A court, therefore, will *not* grant a motion for reconsideration if the movant "merely reasserts...arguments previously made...all of which were carefully considered by the Court." *Id.* (citation omitted).

DISCUSSION

In its present motion, plaintiff alleges that this court committed a "manifest error of law" by using federal tax standards to determine whether plaintiff had standing under the Export Clause. The court's inquiry here then becomes: Whether plaintiff has standing under the Export Clause to recover federal excise taxes paid to its suppliers given the fact that it is not considered a taxpayer under federal tax statutes. That inquiry is still answered in the negative, the court finding that the plaintiff has merely reasserted arguments which we have already carefully considered.

This court is fully mindful of the gravity of plaintiff's position is this case. That is particularly so in view of the substantial sums of money at issue. Plaintiff naturally, the court is well aware, wishes to proceed to trial on the merits on the entire amount of its original claim, and seeks to establish standing

under a law having (perceived) broader application than does the tax code, *i.e.*, the Export Clause. Notwithstanding plaintiff's plight, this court is bound by judicial sobriety rather than gratuity in its interpretation and application of the law. And while the plaintiff has apparently taken numerous interpretive liberties in construing the law in its favor, this court declines to take such leaps in its reading and application of the law.

 Determining whether plaintiff has the requisite standing under the Export Clause, according to the three elements set forth in *Lujan*,[6] has already been fully addressed by this court. But perhaps the court did not go far enough to convince plaintiff why its claim must fail. Again, to establish standing, (1) plaintiff must have suffered an injury in fact—an invasion of a legally protected interest; (2) there must be causation—the injury must be fairly traceable to the challenged action of the defendant (and not the result of the independent action of some third party not before the court); and (3) there must be the likelihood of redress by a favorable decision. *Lujan*, 504 U.S. at 560–61, 112 S.Ct. 2130.

 To satisfy the first element, plaintiff must show that it has a legally protected interest under the Export Clause. The Export Clause states that "No Tax or Duty shall be laid on Articles exported from any State." U.S. Const. art. I, § 9, cl. 5. This mandate strictly prohibits any tax or duty, discriminatory or not, that falls on exports during the course of exportation. *Cyprus Amax Coal Co. v. United States*, 205 F.3d 1369, 1373 (Fed.Cir.2000) (citing *United States v. IBM Corp.*, 517 U.S. 843, 848, 116 S.Ct. 1793, 135 L.Ed.2d 124 (1996)). "The necessary implication of the Export Clause[']s unqualified proscription is that the remedy for its violation entails a return of money unlawfully exacted."[7] *Id.* Therefore, in order to have a legally protected interest, plaintiff must have had monies unlawfully

---

6. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992).

7. Also implicit in a *remedy* entailing the *return* of "money unlawfully exacted" is that the money

would be returned to the party from whom the tax was exacted; *ergo*, the party that was deemed legally liable for paying the tax.

exacted from it based upon exports during the course of exportation.

Plaintiff disagrees that the monies (tax or duty) had to have been exacted directly from it and "submits that the Court's April 10 decision fundamentally failed to apply *Cyprus Amax*." Pl. motion at 3. Plaintiff informs the court that "the *Cyprus Amax* decision shows that statutory standing for a refund claim and constitutional standing for an Export Clause claim are not coterminous." *Id.* Instead, "the Federal Circuit recognized that Cyprus 'had two alternative avenues through which to obtain relief—a tax refund action or a cause of action based on the Export Clause.'" *Id.* (citing *Cyprus Amax*, 205 F.3d at 1375). Continuing, plaintiff claims that "[i]n rejecting Ammex's claim of standing under the Export Clause, the Court read the standing requirement of the federal tax statutes into the Export Clause.... The Court held that since the incidence of tax was on the supplier, and not Ammex, Ammex could not establish injury in fact caused by the Government. That construction is manifest error." Pl. motion at 3.

In *Cyprus Amax*, producers, sellers and exporters of coal brought an action seeking the return of coal excise taxes paid under the Coal Sales Tax, alleging that the tax violated the Export Clause and the Takings Clause under the U.S. Constitution. The Court of Federal Claims dismissed the action for lack of jurisdiction under the Tucker Act due to the coal companies' failure to comply with the administrative process for obtaining a tax refund (via the tax code). On appeal, the Federal Circuit held that the Export Clause provided an independent cause of action for monetary remedies that invoked the jurisdiction of the Court of Federal Claims without the necessity of pursing an administrative refund claim.[8] 205 F.3d at 1369–70.

Plaintiff points to the Circuit Court's holding that "'the cause of action based on the Export Clause is self-executing; that is, ... a party can recover for payment of taxes under the Export Clause independent of the tax refund statute.'" Pl. motion at 4 (citing *Cyprus Amax*, 205 F.3d at 1374). The plain-

tiff reads from that very holding that "a party may have standing to bring a claim under the Export Clause for taxes unlawfully imposed even if the party is not the 'taxpayer' under the federal statutes." Pl. motion at 4. In its next sentence, plaintiff further postulates that: "[w]hile the plaintiff in *Cyprus Amax* paid taxes directly to the IRS, it is clear from the Federal Circuit's decision that this fact was not a necessary predicate to the court's holding[ ]." *Id.*

If plaintiff's interpretation is "clear" from the reading of the Circuit Court's holding, then this court's reading comprehension fails it miserably. There is nothing in the isolated reading of the Circuit Court's language that supports plaintiff's postulation, nor can any such support be found in the contextual reading. *Cyprus Amax* unequivocally stands for the proposition (as does *Hatter v. United States*, 953 F.2d 626 (Fed.Cir.1992)) that a *taxpayer* may bring a cause of action in this court under the Export Clause as an alternative to pursuing that same claim under the tax code. This court, in its April 10 opinion, did not in anyway suggest, imply, or state otherwise. In fact, the *Cyprus Amax* case was not mentioned at all in this court's opinion because that case had no bearing on this court's analysis of whether plaintiff had *standing* to bring a claim under the Export Clause. Without question, *Cyprus Amax* is a *jurisdictional* case. Indeed this court's inquiry was one of propriety, that is to say, whether plaintiff was the *proper party* to bring the claim, having duly invoked this court's jurisdiction.

At all times, and in each of the cases cited to in its opinion, the *Cyprus Amax* court spoke in the context of the party upon whom the tax was, in fact, levied by the government, *ergo*, the *taxpayer*. That fact is particularly stated by the Circuit Court in its analysis of the case that it considered to be both "parallel[ ]" and "controlling" in its decision, *Cyprus Amax v. United States*, 205 F.3d at 1375. In drawing a parallel to the *Hatter* case, the Circuit Court stated:

> The present case closely parallels *Hatter* in several respects. First, both cases raise

---

8. The Circuit Court did not reach the issue as it pertained to the Takings Clause.

the same *jurisdictional* issue: whether a *taxpayer* can invoke jurisdiction under the Tucker Act through a constitutional provision without first complying with the tax refund statute.

*Id.* (emphasis added).

Unmistakably, the "party" in the issue framed by the Circuit Court is the taxpayer. And that characterization is consistent with this court's opinion where the plaintiff charges this court with manifest error. There was no misunderstanding by this court of the distinction the *Cyprus Amax* court made between bringing a cause of action under the Export Clause versus the tax code. This court rightly exercised its jurisdiction under the Tucker Act, 28 U.S.C. § 1491(a)(1), to hear the plaintiff's claims against the United States that were founded upon both the Constitution and various acts of Congress. The issue raised by the defendant, here at bar, on motion for summary judgment, however, was not one of jurisdiction, but one of *standing.*

The threshold issue here is—who was the proper party to bring the tax refund claim: first, under the general provisions of the tax code, and then, under the Export Clause of the Constitution. While the court was not applying standing standards under the tax statutes to the Export Clause, as the plaintiff accuses, the court was addressing the undeniable fact, under both analyses, that the plaintiff did not pay the tax to the government, or stated differently, clearly the defendant did *not* exact monies from the plaintiff. The excise tax was levied against plaintiff's suppliers, absent any contemplation in the taxing statute [9] itself that said tax should be passed on to the plaintiff. On the contrary, plaintiff contracted with its suppliers to pay to them costs approximating the economic equivalence of taxes, and now argues that it, *ipso facto,* stands in the shoes of the taxpayer, *i.e.,* the party entitled to receive from the government a return of money that was unlawfully exacted from *it.*

**9.** 26 U.S.C. § 4081.

**10.** "Ammex has demonstrated, and this Court held, that Ammex did in fact place goods in the stream of exportation by selling for export the

The court ended its analysis here, in its April 10 opinion, by finding that because the government had not taxed Ammex, it could not establish an injury in fact caused by the defendant, thus no standing. Again, the court stands by that holding. However, to satisfy the plaintiff's further inquiry, the court will continue the analysis. Even assuming, *arguendo,* that plaintiff were the proper party to request payment, a legally protected interest would only exist if the tax was laid on *exports while in the stream of exportation.*

The legal basis of plaintiff's Export Clause claim lies with its broad-based notion that *any* purchases it makes, as a matter of law, are exports, due to its duty-free status, and necessarily enters initially and irretrievably into the stream of exportation at *plaintiff's point of purchase.* Plaintiff postulates that: "As a duty-free sales enterprise that sells merchandise, as a matter of law, solely for exportation, Ammex clearly falls within the zone of interests protected by the Export Clause." Pl. motion at 6 n. 4. "As a matter of law, the motor fuel sold by Ammex was at all times in export transit." Pl. motion at 7. "Ammex is a federally authorized duty-free sales enterprise, which as a matter of federal law sells goods exclusively for export." Pl. Reply Br. at 1.

The foregoing is a facially erroneous position to take given the language contained in the statutes and regulations which govern duty-free stores. Plaintiff attempts, it appears, to create for itself entitlements that far exceed the written provisions of the law. This court has previously explained that the governing statutes and regulations do not describe or characterize plaintiff as an *exporter,* and the court now, more pointedly, explains that nor are its purchases, *ipso facto, exports* in the export stream at (plaintiff's) point of purchase. Plaintiff points to the court's opinion where the court found that the fuel was, in fact, ultimately exported.[10] But what plaintiff fails to accede to is that, in so finding, the court held that the

motor fuel that it purchased from its suppliers." Pl. motion at 5 (citing *Ammex, Inc.,* 52 Fed.Cl. at 314).

fuel entered the stream of exportation much further down in the commercial chain than at the point of its purchases from its suppliers.

In *Kosydar v. National Cash Register Co.,* 417 U.S. 62, 94 S.Ct. 2108, 40 L.Ed.2d 660 (1974), the Supreme Court squarely addressed what constitutes *exports entering the stream of exportation.* That case involved a manufacturer ("NCR") of cash registers, accounting machines and electronic data processing systems. The machines there at issue had been inspected, packed, crated and stored in a warehouse awaiting shipment abroad, when a state personal property tax was assessed against them by Ohio's Tax Commissioner. NCR sought to invoke the protections of the Import–Export Clause to preclude its "exports" from state taxation. The Supreme Court upheld the tax stating that "the exemption from taxation in the Import–Export Clause 'attaches to the export and not to the article before its exportation.'" [11] *Id.* at 67, 94 S.Ct. 2108 (citing *Cornell v. Coyne,* 192 U.S. 418, 427, 24 S.Ct. 383, 48 L.Ed. 504 (1904)). The Court noted "that not every preliminary movement of goods *toward eventual* exportation was sufficient to invoke the protection of the Import–Export Clause." *Id.* at 69 n. 6, 94 S.Ct. 2108 (emphasis added).

The plaintiff in *Kosydar* argued that by their design, the machines were only suitable for foreign markets. The keyboards, printing mechanisms and decimal point placement, among other things, caused the machines to be obsolete for domestic use, thereby creating an "international inventory" comprised of exports. Notwithstanding, the Court answered that "'it is not enough that there is an intent to export, or a plan which contemplates exportation, or an integrated series of events which will end with it.... It is the entrance of the articles into the export stream that marks the start of the process of exportation. Then there is certainty that the goods are headed for their foreign destination and will not be diverted to domestic use. Nothing less will suffice.'" *Id.* at 68, 94

S.Ct. 2108 (citing *Empresa Siderurgica v. County of Merced,* 337 U.S. 154, 156–57, 69 S.Ct. 995, 93 L.Ed. 1276 (1949)).

"At the time that the respondent's machines were assessed for taxation, they were sitting in the Dayton warehouse awaiting shipment. Title and possession were in NCR, payment had not yet been made by the putative purchasers, no export license had issued, and the machines were in the complete control of the respondent." *Id.* at 69, 94 S.Ct. 2108. "These machines were no different from any other mass of goods in a warehouse awaiting shipment." *Id.* at 70 n. 7, 94 S.Ct. 2108.

Here, in the instant case, just like the plaintiff in *Kosydar,* Ammex's fuel purchases were destined for delivery to its warehouse(s) (or fuel storage tanks) when the excise tax was allegedly passed on by plaintiff's suppliers. Although Ammex's operation may contemplate *eventual* exportation of subject fuel, there was no absolute certainty that the fuel would not be diverted, at some unknown point, for domestic use prior to its actual entry into the stream of exportation. This is especially true since, during the periods at issue, U.S. Customs was not monitoring plaintiff's fuel inventories because it did not consider plaintiff's fuel to be duty-free merchandise.[12] At the time the fuel in issue was purchased for shipment to its storage tanks, the title and possession continued in Ammex, no putative (retail) purchasers were as yet identifiable, arguably no export license (or in this case, duty-free classification) had issued, and the fuel was in the complete control of Ammex.

Undoubtedly, like NCR's machines, "such goods do not cease to be part of the general mass of property in the State, subject, as such, to its jurisdiction, and to taxation in the usual way, until they have been shipped, or entered with a common carrier for transportation to another State, or have been started upon such transportation *in a continuous route or journey.*" *Id.* at 66–67, 94 S.Ct.

---

**11.** "A long line of cases has recognized [ ] that the meaning of 'export' is the same under [the Export Clause] as under the Import–Export Clause." *Kosydar,* 417 U.S. at 67 n. 5, 94 S.Ct. 2108 (citations omitted).

**12.** Whether the fuel was classified as duty-free merchandise during the operative periods is one of the factual issues reserved for trial.

2108 (citing *Coe v. Errol,* 116 U.S. 517, 527, 6 S.Ct. 475, 29 L.Ed. 715 (1886)) (emphasis added). "In *A.G. Spalding & Bros. v. Edwards,* 262 U.S. 66, 43 S.Ct. 485, 67 L.Ed. 865 [(1923)], th[e] Court decided that delivery of baseballs and bats to an export carrier for shipment to Venezuela constituted a significant 'step in exportation.'" *Id.* at 67, 94 S.Ct. 2108. "Similarly, in *Richfield Oil Corp. v. State Board of Equalization,* 329 U.S. 69, 67 S.Ct. 156, 91 L.Ed. 80 [(1946)], it was held that the delivery of oil into the storage tanks of a New Zealand-bound steamer 'marked the commencement of the movement of the oil abroad.'" *Id.* Hence, Ammex's fuel did not commence movement abroad until it was delivered into the fuel supply tanks of its customers' vehicles.

CONCLUSION

Consistent with this court's opinion of April 10, 2002, plaintiff's fuel had not entered the stream of exportation at the point of purchase from its suppliers and, therefore, cannot invoke the protection of the Export Clause, assuming it was taxed (indirectly) by the government. Plaintiff thereby fails to establish a legally protected interest under the Export Clause, thus has no injury in fact. Without an injury in fact, there is no standing. Plaintiff's motion for reconsideration of this court's opinion of April 10, 2002, is hereby DENIED.

IT IS SO ORDERED.