**ENGLEWOOD TERRACE LIMITED PARTNERSHIP, a Michigan Limited Partnership, Plaintiff,**

v.

**UNITED STATES, Defendant.**

No. 03–2209C.

United States Court of Federal Claims.

Jan. 24, 2011.

Donald S. Samuelson, Law Offices of Donald S. Samuelson, Lake Forest, Illinois, for the plaintiff.[1]

Douglas K. Mickle, Senior Trial Counsel, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C., for the defendant. With him were Christopher A. Bowen, Trial Attorney; Jeanne E. Davidson, Director, Commercial Litigation Branch; and Tony West, Assistant Attorney General, Civil Division. Of counsel, Gregory G. Gustin, Maria T. Baguio, Lorraine C. Shoto, and Jaret R. Fishman, Office of General Counsel, United States Department of Housing and Urban Development, Chicago, Illinois.

## ORDER

HORN, Judge.

### FINDINGS OF FACT

Judgment was entered in the above captioned case on August 4, 2010 after extended pre-trial and trial proceedings, post-trial briefings by the parties, and many requests for extensions of time. Now, after judgment, plaintiff filed a post-judgment motion for "limited supplemental discovery." Three days later, plaintiff filed a second motion to alter or amend the judgment of the court. Defendant objects to both motions. The parties have fully briefed both motions.

---

1. On December 22, 2008, Mr. Samuelson relieved his attorney, Peter V. Baugher, who had handled the case through trial, of any responsibility in the case. Mr. Samuelson, who is a licensed attorney, now represents the plaintiff's interests.

The court has issued multiple previous opinions in this case. The first opinion in the case was issued by Judge Victor J. Wolski, the original Judge assigned to the case. *See Englewood Terrace Limited P'ship v. United States,* 61 Fed.Cl. 583 (2004) (*Englewood I*). Subsequently, the case was re-assigned to the undersigned Judge. An earlier opinion issued by the court found that the United States had breached the plaintiff's 2000 Housing Assistance Payment (HAP) contract. *See Englewood Terrace Ltd. P'ship v. United States,* 79 Fed.Cl. 516 (2007) (*Englewood II*). This court also previously determined that plaintiff was not entitled to an energy reimbursement or a budget-based rent increase. *See Englewood Terrace Ltd. P'ship v. United States,* 84 Fed.Cl. 649 (2008) (*Englewood III*). The court further found that plaintiff could not offer a new theory of recovery to request an Operating Cost Adjustment Factor (OCAF) rent increase on a motion to reconsider, after trial, and after the court had issued an opinion denying plaintiff's budget-based rent increase claim. *See Englewood Terrace Ltd. P'ship v. United States,* 86 Fed.Cl. 720 (2009) (*Englewood IV*). In its most recent opinion on damages, the court denied plaintiff's claim for lost equity damages, but awarded plaintiff $3,272,217.00 for HAP contract damages. *See Englewood Terrace Ltd. P'ship v. United States,* 94 Fed.Cl. 116 (2010) (*Englewood V*). This Order becomes *Englewood VI.* The extensive findings of fact in the court's earlier opinions will not be repeated here, but are incorporated into this Order. A brief recapitulation of relevant facts specifically related to the issues addressed in this Order is repeated below for ease of reference.

Englewood alleged, and the court agreed, that the United States Department of Housing and Urban Development (HUD) had breached a HAP contract between Englewood and HUD. The HAP contract provided for rent subsidies to be used by the tenants of South Pointe Towers (South Pointe), a high-rise apartment building in Chicago, Illinois. South Pointe was owned by Englewood Terrace Limited Partnership. John J. Hayes was the President of P.M. Group, the Englewood Terrace Limited Partnership's general partner, until December 13, 2002.

Mr. Hayes' P.M. One was the managing agent at South Pointe. On December 13, 2002, DSSA New Englewood Terrace LLC (DSSA), a sole proprietorship of Donald S. Samuelson, replaced P.M. Group as Englewood's general partner. Earlier, on December 1, 2001, Mr. Samuelson's DSSA Management, Inc., which was affiliated with Mr. Samuelson's DSSA, replaced P.M. One as South Pointe's managing agent.

The HAP contract at issue was executed in October 2000 and called for a one year term, followed by three, automatic, one year renewals, which would have continued the contract through September 2004. In December 2000, HUD unilaterally amended the contract into one consisting of a series of short term agreements with no automatic renewals. The short term agreements permanently ended in September 2002. The court held that HUD "should be held to the terms of the original HAP contract it made in October, 2000." *Englewood II,* 79 Fed.Cl. at 535.

On October 1, 2001, Edward Hinsberger, Director of the Chicago Office of Multifamily Housing for HUD, sent an email to Mr. Hayes and Mr. Samuelson stating that "[t]he [Chicago] Housing Authority has advised us that they will begin issuing vouchers for the residents at South Pointe today.... As a result, the Sec. 8 [HAP] contract will be terminated once all of the residents receive their vouchers." Mr. Hinsberger testified at trial that he had told residents on October 1, 2001 that they would be receiving vouchers and "wasn't about to ... turn around and say never mind, you're not going to get them." Mr. Hinsberger also indicated at trial that vouchers did not begin to issue until June of 2002.

On November 30, 2001, HUD issued to Englewood a "Notice of Abatement and Termination" stating that HUD planned to phase out its HAP contract in stages, as it issued Chicago Housing Authority (CHAC) vouchers to tenants. Issuing the CHAC vouchers took longer than HUD originally intended, so HUD proceeded to extend the plaintiff's HAP contract for short term renewal periods, the last of which expired on September 30, 2002. HUD also informed

Englewood that the contract would officially end when CHAC vouchers were distributed to all the tenants, which was determined by the court to have happened by July 2002. *Id.* at 518, 522.

The occupancy rate at South Pointe began to decline in the spring of 2002. It dropped below 85% in April 2002 and below 70% by June 2002. It continued to decrease steadily through October 2002, the month following the expiration of the HAP contract, when the occupancy rate dwindled to 35%. HUD phased out the HAP contract in stages. HUD would permanently cease to pay a HAP subsidy for a specific unit whenever its tenant used the CHAC voucher, either to leave, or, if the unit was acceptable, to remain at South Pointe.[2] HUD also permanently stopped HAP payments when a unit that had received the subsidy became vacant for any other reason. During this time, the costs to run South Pointe remained constant for Englewood, and Englewood continued to pay high interest payments on its loan from Community Investment Corporation (CIC).

The HAP contract at South Pointe ended on September 30, 2002, after the final short term agreement expired and all tenants had been given housing vouchers, permitting them to either remain at South Pointe or to relocate to other housing with their vouchers. HUD based its termination of the HAP contract on its finding that Englewood had not provided decent, safe and sanitary housing to tenants, as required by the terms of the HAP contract. The specific basis for the termination of the HAP contract cited by HUD was a March 2, 2001, Real Estate Assessment Center (REAC) inspection of South Pointe. After trial, this court found that HUD's decision to terminate Englewood's HAP contract was made even before HUD received Englewood's plan to correct deficiencies, identified in the March 2, 2001 REAC inspection. The court concluded that

Englewood was not afforded a full and meaningful opportunity to cure the deficiencies, identified in the March 2, 2001 REAC inspection. The record reflects that, although HUD had urged that South Pointe be placed under new ownership and management, under someone other than Mr. Hayes, once new ownership and management were in place, there appeared to be a reluctance on the part of HUD to provide a meaningful opportunity for the new ownership and management, under Mr. Samuelson, to take corrective action, or for HUD to acknowledge any improvements at South Pointe. HUD's posture thereby undermined its contract termination action against Englewood.

In January 2002, Englewood defaulted on its CIC loan. CIC filed a foreclosure action, which was voluntarily withdrawn in March 2002, and then reinstated in May 2002. CIC withdrew the action a second time after it received assurances that Englewood would obtain a new loan, insured by HUD, which would pay off the entire old mortgage and provide funds for a complete rehabilitation of South Pointe. This second loan was provided through Reilly Mortgage, a private financial institution, but was insured by HUD against default through the section 221(d)(4) loan program.[3] The section 221(d)(4) loan program requires the property owner to use the loan funds for new construction or "substantial rehabilitation." *Mortgage Insurance for Rental and Cooperative Housing: Section 221(d)(3) and Section 221(d)(4)*, http//www.hud.gov/offices/hsg/mfh/progdesc/rentcoophsg221d3n4.cfm. The Project Development Office of HUD closed on the HUD-insured loan in December of 2002. Englewood also had received an additional loan of $750,000.00 from the Illinois Housing Development Authority.

In *Englewood II*, the court observed that the parties had confused repairs mandated by the 2001 REAC report pursuant to the

---

**2.** A HAP contract is building specific, and by living in a building that has a HAP contract, an eligible tenant receives subsidized rent. A CHAC voucher, on the other hand, can be used by the tenant anywhere the Chicago Housing Authority has approved for its use. When a tenant elected to use a voucher, even at South Pointe, Englewood ceased to receive a HAP subsidy from HUD

and, instead, received a voucher payment from the Chicago Housing Authority.

**3.** The program exists pursuant to the National Housing Act, codified at 12 U.S.C. § 1715*l* (2006), as amended. Program regulations and eligibility requirements currently are found at 24 C.F.R. § 221.501 (2010).

HAP contract and repairs that were to be carried out as a result of the section 221(d)(4) loan. The HUD-insured, section 221(d)(4) loan required that Englewood restore South Pointe to "like new" condition, a standard that went beyond the decent, safe and sanitary condition requirement of the HAP contract and REAC inspection. *Englewood II,* 79 Fed.Cl. at 544. The section 221(d)(4) rehabilitation required that two to three floors of South Pointe remain unoccupied while the building was renovated. The REAC directed repairs, on the other hand, could be performed while the tenants lived in the units.

After the loss of the HAP contract, Englewood struggled to attract new tenants. To advertise the building, Englewood placed articles in local papers and printed marketing brochures. Englewood also made efforts to retain current South Pointe tenants who were financially responsible and to encourage problematic tenants to use their vouchers elsewhere. In addition, Englewood also actively recruited other voucher tenants from the Chicago Housing Authority offices. Through these efforts, it filled approximately fifty-five more units at South Pointe by September 2003. This placed its vacancy rate at around 56%.

In the spring of 2004, after depleting all the funds loaned to it, Englewood defaulted on the HUD-insured, section 221(d)(4) mortgage. Reilly Mortgage, which had made the loan, replaced DSSA Management, Inc., Mr. Samuelson's management company, and assumed responsibility for management on May 21, 2004. Reilly Mortgage instituted an action in the local circuit court for the appointment of a receiver and for the foreclosure of South Pointe. In July 2004, South Pointe was placed under court ordered receivership, and Reilly Mortgage assigned the mortgage to HUD, which eventually sold the mortgage at auction to a private party in 2005.

4. The defendant observes that "Englewood's September 3, 2010 motion for reconsideration is at odds with its present [August 31, 2010] motion to reopen discovery. In the discovery motion, Englewood admits that it did not produce evidence that is needed to prove a portion of its

## DISCUSSION

Plaintiff seeks to reopen discovery and to alter or amend the post-trial judgment of this court pursuant to Rule 59 of the Rules of the United States Court of Federal Claims (RCFC) (2010), titled "New Trial; Reconsideration; Altering or Amending a Judgment." Initially, plaintiff filed a post-judgment motion to reopen discovery pursuant to RCFC 59(a)(2), titled "Further Action After a Trial." RCFC 59(a)(2) states: "The court may, on motion under this rule, open the judgment if one has been entered, take additional testimony, amend findings of fact and conclusions of law or make new ones, and direct the entry of a new judgment." Three days later, plaintiff filed a separate motion under RCFC 59(e), titled "Motion to Alter or Amend a Judgment," on various other grounds.[4] The two motions are related and essentially request recomputation of the damages awarded by the court, including adjustment of the date from which to start computing damages, the vacancy rate used to calculate damages, and the right to an OCAF rent increase, as well as a request to allow plaintiff to reopen discovery to obtain CHAC vouchers for the record in support of its effort to have the court recalculate damages.

■ Reconsideration of a judgment pursuant to RCFC 59 is not intended to permit a party to retry its case when it previously was afforded a full, fair and, in this case, even indulgent, opportunity to do so. The United States Court of Appeals for the Federal Circuit has stated that: "The decision whether to grant reconsideration lies largely within the discretion of the [trial] court." *Yuba Natural Res., Inc. v. United States,* 904 F.2d 1577, 1583 (Fed.Cir.), *reh'g denied* (Fed.Cir. 1990); *see also Carter v. United States,* 207 Ct.Cl. 316, 318, 518 F.2d 1199, 1199 (1975), *cert. denied,* 423 U.S. 1076, 96 S.Ct. 861, 47 L.Ed.2d 86 *reh'g denied,* 424 U.S. 950, 96 S.Ct. 1423, 47 L.Ed.2d 356 (1976); *Webster v. United States,* 92 Fed.Cl. 321, 324, *recons.*

claims, and, therefore, seeks to reopen discovery. Its September 3, 2010 motion for reconsideration, however, is based upon Englewood's belief that, although the trial record is sufficient to prove its claim, the Court missed some portion of the evidence." (internal citation omitted).

*denied,* 93 Fed.Cl. 676 (2010); *Alpha I, L.P. ex rel. Sands v. United States,* 86 Fed.Cl. 126, 129 (2009); *Banks v. United States,* 84 Fed.Cl. 288, 291–92 (2008); *Corrigan v. United States,* 70 Fed.Cl. 665, 667–68 (2006), *aff'd,* 223 Fed.Appx. 968 (Fed.Cir.), *reh'g and reh'g en banc denied* (Fed.Cir.), *cert. denied,* 552 U.S. 892, 128 S.Ct. 338, 169 L.Ed.2d 155 (2007); *Tritek Techs., Inc. v. United States,* 63 Fed.Cl. 740, 752 (2005); *Keeton Corr., Inc. v. United States,* 60 Fed.Cl. 251, 253 (2004); *Paalan v. United States,* 58 Fed.Cl. 99, 105 (2003), *aff'd,* 120 Fed.Appx. 817 (Fed.Cir.), *cert. denied,* 546 U.S. 844, 126 S.Ct. 91, 163 L.Ed.2d 108 (2005); *Citizens Fed. Bank, FSB v. United States,* 53 Fed.Cl. 793, 794 (2002).

▮▮▮ "Motions for reconsideration must be supported 'by a showing of extraordinary circumstances which justify relief.'" *Caldwell v. United States,* 391 F.3d 1226, 1235 (Fed.Cir.2004) (quoting *Fru–Con Constr. Corp. v. United States,* 44 Fed.Cl. 298, 300 (1999)), *reh'g en banc denied* (Fed.Cir.), *cert. denied,* 546 U.S. 826, 126 S.Ct. 366, 163 L.Ed.2d 72 (2005); *see also Seldovia Native Ass'n Inc. v. United States,* 36 Fed.Cl. 593, 594 (1996), *aff'd,* 144 F.3d 769 (Fed.Cir.1998). Courts must address reconsideration motions with "exceptional care." *Carter v. United States,* 207 Ct.Cl. at 318, 518 F.2d at 1199; *see also Global Computer Enters. v. United States,* 88 Fed.Cl. 466, 468 (2009). "To prevail on a motion for reconsideration, the movant must point to a manifest error of law or mistake of fact. Specifically, the moving party must show: (1) the occurrence of an intervening change in the controlling law; (2) the availability of previously unavailable evidence; or (3) the necessity of allowing the motion to prevent manifest injustice." *Matthews v. United States,* 73 Fed.Cl. 524, 526 (2006) (citations omitted); *see also Dairyland Power Coop. v. United States,* 90 Fed. Cl. 615, 652 (2009), *recons. denied,* No. 04–106C, 2010 WL 637793 (Fed.Cl. Feb. 22, 2010); *Prati v. United States,* 82 Fed.Cl. 373, 376 (2008), *aff'd,* 603 F.3d 1301 (Fed.Cir. 2010), *reh'g en banc denied* (Fed.Cir.), *cert. denied,* —— U.S. ——, 131 S.Ct. 940, 178 L.Ed.2d 754 (2011); *Tritek Techs., Inc. v. United States,* 63 Fed.Cl. at 752; *Bannum, Inc. v. United States,* 59 Fed.Cl. 241, 243

(2003); *Citizens Fed. Bank, FSB v. United States,* 53 Fed.Cl. at 794; *Strickland v. United States,* 36 Fed.Cl. 651, 657, *recons. denied* (1996); *Bishop v. United States,* 26 Cl.Ct. 281, 286, *recons. denied* (1992). "Manifest," as in "manifest injustice," is defined as "clearly apparent or obvious." *Ammex, Inc. v. United States,* 52 Fed.Cl. 555, 557 (2002), *aff'd,* 384 F.3d 1368 (Fed.Cir.2004), *cert. denied,* 544 U.S. 948, 125 S.Ct. 1697, 161 L.Ed.2d 525 (2005). "Where reconsideration is sought due to manifest injustice, the moving party can only prevail if it demonstrates that the injustice from the case is 'apparent to the point of being indisputable.'" *Shirlington Limousine & Transp., Inc. v. United States,* 78 Fed.Cl. 27, 31 (2007) (quoting *Pac. Gas & Elec. Co. v. United States,* 74 Fed.Cl. 779, 785 (2006), *aff'd in part, rev'd in part on other grounds,* 536 F.3d 1282 (Fed.Cir.2008)). "A court, therefore, will *not* grant a motion for reconsideration if the movant 'merely reasserts ... arguments previously made ... all of which were carefully considered by the court.'" *Ammex, Inc. v. United States,* 52 Fed.Cl. at 557 (quoting *Principal Mut. Life Ins. Co. v. United States,* 29 Fed.Cl. 157, 164 (1993), *aff'd,* 50 F.3d 1021 (Fed.Cir.), *reh'g denied, en banc suggestion declined* (Fed.Cir.1995)) (emphasis in original); *see also Webster v. United States,* 92 Fed.Cl. at 324; *Tritek Techs., Inc. v. United States,* 63 Fed.Cl. at 752.

▮▮▮ Moreover, a party will not prevail on a motion for reconsideration "by raising an issue for the first time on reconsideration when the issue was available to be litigated at the time the complaint was filed." *Matthews v. United States,* 73 Fed.Cl. at 526; *see also Bluebonnet Sav. Bank, FSB v. United States,* 466 F.3d 1349, 1361 (Fed.Cir.2006) ("Although the government makes an elaborate argument in its brief ... the government never made that argument to the trial court until its motion for reconsideration following the trial court's issuance of its decision. As the trial court noted in denying the motion, an argument made for the first time in a motion for reconsideration comes too late, and is ordinarily deemed waived and not preserved for appeal." (citing *Lamle v. Mattel, Inc.,* 394 F.3d 1355, 1359 n. 1 (Fed.Cir.

2005) and *Caldwell v. United States*, 391 F.3d at 1235)) (other citations omitted); *Yuba Natural Res., Inc. v. United States*, 904 F.2d at 1582–83; *Gelco Builders & Burjay Constr. Corp. v. United States*, 177 Ct.Cl. 1025, 1036–37 n. 7, 369 F.2d 992, 1000 n. 7 (1966); *Magnum Opus Techs., Inc. v. United States*, 94 Fed.Cl. 553, 558 (2010) (court rejected argument made for the first time in a motion to alter or amend the judgment, citing *Bluebonnet Sav. Bank, FSB v. United States*, 466 F.3d at 1361); *Young v. United States*, 92 Fed.Cl. 425, 435 (court rejected new claim made in a motion for reconsideration) (citations omitted), *recons. denied*, 94 Fed.Cl. 671 (2010); *S. Nuclear Operating Co. v. United States*, 79 Fed.Cl. 135, 137 (2007), *appeal dismissed* (Fed.Cir.2008); *Stockton E. Water Dist. v. United States*, 76 Fed.Cl. 497, 500 (2007), *aff'd in part, vacated in part, rev'd in part on other grounds*, 583 F.3d 1344 (Fed. Cir.2009).

*Motion to Reopen Discovery and to Alter or Amend the Judgment—Damages*

After trial and judgment, plaintiff requests the court to reopen the judgment in order to reopen discovery. Plaintiff seeks to locate and supplement the record with CHAC vouchers in order to reassess the damages awarded.[5] In *Englewood V*, the court awarded plaintiff $3,272,217.00 in HAP contract damages. HAP contract damages were assessed as a function of the issuance of vouchers to tenants, and the subsequent use or exercise of the vouchers.[6] *See Englewood V*, 94 Fed.Cl. at 127. The plaintiff's HAP contract was phased out in stages. When a tenant exercised his or her voucher, Englewood stopped receiving HAP payments for that unit. In *Englewood V*, the court concluded that plaintiff was unable to cite to any exhibit in the record which would reliably inform the court of the specific date on which the vouchers were issued. Moreover, just because a tenant received a voucher did not mean that the voucher was immediately exercised, thereby impacting HAP payments to Englewood. *Id.*

Plaintiff, unsatisfied with the $3,272,217.00 in HAP contract damages awarded by the court, *id.* at 134, effectively seeks to retry this case. Prior to trial, plaintiff was afforded the opportunity for discovery in support of its case, including damages. Plaintiff had multiple opportunities to introduce exhibits in support of damages at trial, and even to take advantage of a month-long break in the trial to locate additional documents supporting its damages claim. Moreover, after plaintiff rested and the trial record was closed, plaintiff was afforded the opportunity for post-trial briefing, and to identify evidence in the record and present arguments in support of its damages claims.

At trial, plaintiff attempted, through the testimony of Mr. Samuelson, to explain plaintiff's damages exhibits in support of its claim, including lost HAP contract revenues. Plaintiff also had opportunities to explain its argument that the calculation of lost HAP contract revenues should begin on October 1, 2001. The record contains plaintiff's chart titled "Englewood Lost HAP Revenue by Month (2001–2004)" in support of plaintiff's view of damages. During his testimony, Mr. Samuelson discussed voucher income, the is-

---

5. Among the arguments in support of plaintiff's motion to reopen discovery and alter or amend the judgment issued by the court, Mr. Samuelson cites to *Circle K Corp. v. United States*, 23 Cl.Ct. 659 (1991). The *Circle K* decision, however, was vacated to facilitate settlement, No. 12–86T, 1996 WL 904545 (Fed.Cl. Nov. 15, 1996). The Order vacating the *Circle K* decision was published and stated: "The withdrawal of those orders [dated May 16, 1991 and August 2, 1991] should be published so that those who are conducting legal research may easily find that the orders the Court filed on May 16, 1991, and on August 2, 1991, have been withdrawn. Otherwise, many may erroneously conclude that those orders constitute persuasive authority for the legal opinions expressed therein." *Id.* at *1.

6. Plaintiff describes the process as follows: "Obtaining a voucher is a quick and easy process. It is a much longer process for the resident to identify appropriate housing, having a CHAC inspector confirm that it meets HUD Housing Quality Standards and that the rent is determined to be 'reasonable,' signing the lease and executing the individual HAP contract for rent subsidy.... Once the South Pointe residents received their vouchers they continued to live at South Pointe in housing subsidized by the HAP contract until CHAC informed Englewood that the resident had exercised their voucher and moved away from South Pointe."

suance of housing vouchers, and declining HAP contract revenues. On January 27, 2007, after the close of the direct examination of Mr. Samuelson, plaintiff indicated there would be no witnesses for the plaintiff, other than Mr. Samuelson.

Defendant objected to the absence of supporting data for plaintiff's figures on HAP contract damages, and for a variety of reasons, and in an abundance of generosity, after presentation of the defendant's case, the court adjourned the trial for a month, during which time Mr. Samuelson was afforded an opportunity to gather his backup records in support of the damages summaries he had offered at trial. Mr. Samuelson was scheduled to retake the stand when the trial reconvened a month later, and if he was able to locate damages documentation, he could continue his direct testimony on damages, followed by defendant's cross-examination of Mr. Samuelson.

When the trial reconvened a month later, Mr. Samuelson was the sole witness to retake the stand for additional direct and cross-examination. Mr. Samuelson stated that he had found some documentation to support his lost HAP contract revenue summaries, but not the primary source CHAC vouchers. At this point, plaintiff offered the exhibits Mr. Samuelson had available into evidence, which were admitted without objection from the government. With the conclusion of Mr. Samuelson's additional testimony, both parties rested their cases, and the court closed the record. After the record was closed, the parties were afforded the opportunity to present closing arguments and to submit post-trial briefings. While the court was considering its damages opinion, *Englewood V*, the parties were directed to file a notice to the court, "stating whether the specific dates the CHAC vouchers were issued can be found in the current exhibits and the trial testimony and, if so, where this information can be located." Both parties responded in the negative.

■ It is well established that, " '[t]he litigation process rests on the assumption that both parties present their case once, to their best advantage;' a motion for reconsideration thus should not be based on evidence that

was readily available at the time the motion was heard." *Seldovia Native Ass'n Inc. v. United States*, 36 Fed.Cl. at 594 (quoting *Aerolease Long Beach v. United States*, 31 Fed.Cl. 342, 376, *aff'd*, 39 F.3d 1198 (Fed.Cir. 1994) (table)). "Post-opinion motions to reconsider are not favored, especially 'where a party has had a fair opportunity to ... litigate the point in issue.' " *Aerolease Long Beach v. United States*, 31 Fed.Cl. at 376 (quoting *Prestex, Inc. v. United States*, 4 Cl.Ct. 317, 318, *aff'd*, 746 F.2d 1489 (Fed.Cir. 1984) (citing *Gen. Elec. Co. v. United States*, 189 Ct.Cl. 116, 117–18, 416 F.2d 1320, 1321 (1969))) (omission in original; other citation omitted).

Plaintiff " ' ' "should not ... be permitted to attempt an extensive re-trial based on evidence which was manifestly available at the time of the hearing." ' " *Totolo/King Joint Venture v. United States*, 89 Fed.Cl. 442, 444 (2009) (quoting *Seldovia Native Ass'n Inc. v. United States*, 36 Fed.Cl. at 594) (quoting *Gelco Builders & Burjay Constr. Corp. v. United States*, 177 Ct.Cl. at 1036–37 n. 7, 369 F.2d at 1000 n. 7) (omission in original). Similarly, motions for reconsideration "must be supported 'by a showing of extraordinary circumstances which justify relief.' " *Caldwell v. United States*, 391 F.3d at 1235 (quoting *Fru–Con Constr. Corp. v. United States*, 44 Fed.Cl. at 300). For reconsideration, the movant must show: " '(1) that an intervening change in the controlling law has occurred; (2) that previously unavailable evidence is now available; or (3) that the motion is necessary to prevent manifest injustice.' " *Totolo/King Joint Venture v. United States*, 89 Fed.Cl. at 444 (quoting *Stockton E. Water Dist. v. United States*, 76 Fed.Cl. at 499) (citation omitted); *see also Matthews v. United States*, 73 Fed.Cl. at 526.

The United States Court of Appeals for the Federal Circuit has rejected new arguments made after trial and stated:

Although the government makes an elaborate argument in its brief ... the government never made that argument to the trial court until its motion for reconsideration following the trial court's issuance of its decision. As the trial court noted in denying the motion, an argument made for

the first time in a motion for reconsideration comes too late, and is ordinarily deemed waived and not preserved for appeal.

*Bluebonnet Sav. Bank v. United States,* 466 F.3d at 1361 (citing *Lamle v. Mattel, Inc.,* 394 F.3d at 1359 n. 1 and *Caldwell v. United States,* 391 F.3d at 1235) (other citations omitted); *see also Matthews v. United States,* 73 Fed.Cl. at 526 (a party will not prevail on reconsideration by raising an issue for the first time on reconsideration "when the issue was available to be litigated at the time the complaint was filed." (citing *Lamle v. Mattel, Inc.,* 394 F.3d at 1359 n. 1 and *Abbott Labs. v. Syntron Bioresearch, Inc.,* 334 F.3d 1343, 1355 (Fed.Cir.), *reh'g denied* (Fed.Cir.2003))) (other citations omitted).

■ Plaintiff argues that the issuance dates of the vouchers were "not on the radar screen of either the government or Englewood," and that the "Court gave no indication of the legal significance of the request." Plaintiff asserts that, "[t]he issue of the dates on which vouchers were issued was first brought to the attention of the parties on July 15, 2010 when this Court issued an order requiring the parties to cite to primary source documents in the record [sic] the date when vouchers began to be issued." [7] Defendant argues that, "[l]ike Englewood's previous attempt to raise claims not presented at trial, this post-judgment attempt to re-open discovery ... is nothing more that [sic] its attempt to seek evidence that it did not produce at trial so it can attempt to re-litigate an issue the Court has already considered and rejected." (footnote omitted). The court agrees.

It is the responsibility of plaintiff, not the defendant or the court, to prove up plaintiff's damages. Although the primary source housing vouchers were not introduced as exhibits at the trial, and plaintiff may not have fully explored the voucher issue in its direct case or in its post-trial briefing, plaintiff's cross-examination of government witnesses at trial reflected an understanding of the importance of the issuance and use of CHAC vouchers and their impact on HAP contract payments and damages. For example, plaintiff's counsel cross-examined government witness Mary Ellen Anderson, Director of Operations of HUD's Chicago Multifamily Hub, as follows:

Q [by plaintiff's counsel] You knew there was [sic] substantial vacancies [at South Pointe].

A [Ms. Anderson] I don't know the level. I just know it was not totally occupied.

Q Well, you knew as of the end of 2002 that the Housing Assistance Program contract had ended, right?

A Yes.

Q And with the end of that contract, vouchers had been issued, right?

[by government counsel] Objection, your Honor. Ms. Anderson didn't testify to anything regarding vouchers.

. . .

Q [by plaintiff's counsel] Yes. When the Housing Assistance payment program was terminated, residents were given vouchers, correct?

A Yes.

After this exchange, the government objected to further testimony on the subject of vouchers, indicating that it had limited the scope of its direct examination intentionally and because the plaintiff could have listed Ms. Anderson as a witness, but did not, the scope of plaintiff's cross-examination also should be limited. The court sustained defendant's objection to further inquiry by plaintiff's counsel about vouchers as beyond the scope of the direct examination. *See* Fed. R.Evid. 611(b) (2010).

---

7. Plaintiff's reference to the court's request is the court's Order of July 15, 2010, which stated:

In reviewing the parties' briefs on the HAP contract breach and lost equity damages claims, each party asserts a different date regarding when the Chicago Housing Authority (CHAC) vouchers began to be issued to South Pointe residents, yet neither party cites to primary source documents in the trial exhibits which support its date. On or before Monday, July 19, 2010, 5:00 p.m., each party shall file a notice with the court, electronically, stating whether the specific date the CHAC vouchers were issued can be found in the current exhibits and the trial testimony and, if so, where this information can be located.

Plaintiff's counsel also cross-examined government witness Theresa DiPietro, a Contract Administration Oversight Monitor for HUD, who like Ms. Anderson was listed only as a defendant's witness, and not cross-designated by plaintiff to testify, as follows:

Q [by plaintiff's counsel] Do you know when vouchers were issued for [South Pointe]?

A [Ms. DiPietro] I do not know when all the vouchers were issued, no.

. . .

Q As of July 2002, do you know how long the residents had known that the vouchers were going to be issued?

A I don't understand what you're asking. Are you asking me off [sic] of the notice date or are you asking me prior to that or—

Q Prior to that.

A Prior to that? I don't know if management notified their residents that the vouchers were forthcoming or not.

Q Okay. But in your view the building [South Pointe] was fairly fully at that point. Correct?

A No, I never said the building was fairly full. What you asked me were there residents there when we went in 2002.

Once again, plaintiff reflected an awareness of the importance of the housing vouchers, as well as of issues related to the departure of tenants.

Plaintiff also argues that neither "Englewood nor the government listed the dates on which vouchers were issued as issues of fact or law to be determined by the Court at trial. . . ." Vouchers, however, were clearly identified as at issue in the pre-trial, Joint Statement of Issues of Fact and Law, dated December 27, 2006. Included in the parties' Joint Statement of Issues of Fact and Law were the following:

[With respect to the HAP contract,] [u]nder what circumstances and procedures could HUD issue Section 8 *vouchers* to tenants to relocate from South Pointe without responsibility for the tenants' lease obligations?

. . .

[Did the government breach the contract] by notifying residents that they would be receiving *vouchers* and relieved of the residents' lease obligations prior to terminating its contract obligations to Englewood?

. . .

[With respect to Englewood's damages claim,] [w]hether Englewood may recover damages for increased costs caused by HUD's decision to terminate the parties' contract and issue *vouchers* to the tenants of South Pointe, and the *amount of such damages* [.] (emphasis added).

Particularly with respect to the last issue, which was submitted by both parties in their Joint Statement of Issues of Fact and Law, vouchers were specifically identified as related to plaintiff's damages.

Plaintiff also argues that the court's damages award was based on a mistake of fact, namely the court's utilization of the July 1, 2002 date to compute the start of damages, rather than plaintiff's preferred date of October 1, 2001. Plaintiff's motion to alter or amend the judgment in order to begin the calculation of damages on October 1, 2001, is not a new issue. *See Englewood V,* 94 Fed. Cl. at 126–27. In its September 3, 2010 motion for reconsideration, plaintiff reasserts that housing vouchers were issued to South Pointe tenants throughout the period October 2001–May 2002. In fact, the dates vouchers were issued to South Pointe tenants varied, and issuance of vouchers did not necessarily mean the vouchers were immediately exercised on the date the voucher was issued. The issuance and exercise of vouchers was an unfolding process. Likewise, damages did not all accrue on the same date. The court's damages opinion in *Englewood V* reflects this volatile situation:

Therefore, although vouchers may have started to issue in the winter of 2001–2002, the lack of primary source documents in the record renders it challenging for the court to ascertain the point at which plaintiff should begin recovering damages. The starting point and amount of damages must be proved by plaintiff with reasonable certainty, and there is little information in the record beyond data points and second hand information for the winter

and spring of 2002. In its response to a court order, the government agreed that July 2002, when Mr. Hinsberger[8] stated the voucher process was complete and the vacancy rates increased dramatically, could be identified as the date on which vouchers had a substantial effect on the occupancy at Englewood. The court, therefore, accepts Mr. Hinsberger's testimony in this regard, and the defendant's acknowledged date, and finds July 1, 2002 as the date of the breach for the purposes of calculating damages.

*Id.* at 127.

Plaintiff acknowledges that primary source documents on voucher issuance were not in the record, and also states that, "[b]y June 2002, *all* of the vouchers had been issued." (emphasis in original). The court similarly stated in its damages opinion that it relied on the government's agreement that by July 2002, the "voucher process was complete and the vacancy rates increased dramatically...." *Id.* The court, therefore, identified July 1, 2002, "as the date on which vouchers had a substantial effect on the occupancy at Englewood," and, therefore, used this date "for the purposes of calculating damages." *Id.* A July 1, 2002 start date for computing damages is consistent with plaintiff's own statement that all vouchers had been issued by June 2002. Plaintiff has pointed to no evidence for the court to amend the start date for computing damages.

Plaintiff had the burden of proof to establish its damages. It was plaintiff's decision as to how to present its evidence on damages and whether or not to submit for the record particular primary source documents in support of its damages claim. Plaintiff, however, did not obtain or submit the primary source vouchers for the record prior to when the record was closed. Now, after the court's issuance of five *Englewood* opinions, and the entry of judgment, plaintiff belatedly seeks to reopen the case to conduct additional discovery and to alter and amend the judgment. Plaintiff had an extended opportunity to conduct discovery, including on the

issue of vouchers, and to present its case to the court before the record closed. Under these circumstances, plaintiff cannot excuse its deficiencies in securing and obtaining the admission of evidence into the record with an assertion of "mistake" on the part of the court. Although plaintiff appears to have understood the relevance of vouchers during the trial and post-trial briefs of this case, plaintiff's present motion to reopen the judgment and discovery, and belatedly to seek and introduce evidence on housing vouchers, is an attempt to do on reconsideration what it did not do during discovery or during the trial of the case.

In support of its motion to reopen discovery and reconsider the judgment, plaintiff has not demonstrated an intervening change in the law, that previously unavailable evidence has now become available, or that reconsideration is necessary to prevent manifest injustice. *See Totolo/King Joint Venture v. United States,* 89 Fed.Cl. at 444; *Matthews v. United States,* 73 Fed.Cl. at 526. Plaintiff enjoyed a full and fair opportunity to prove its damages. Plaintiff's dissatisfaction with the court's damages award, and perhaps even Mr. Samuelson's dissatisfaction with his own and counsel's efforts to prove up damages, is an insufficient basis to reopen and re-litigate the case. If a plaintiff's failure to introduce evidence at trial to prove its damages were to be considered sufficient to justify reconsideration pursuant to RCFC 59, reopening of judgments and relitigation of cases could be allowed in virtually every case in which there was a failure of proof on the part of a party and judgment in favor of the other party. Plaintiff need not agree with the court's findings of fact, and may appeal the court's decision, but the court stands by its damages calculation, which was based on the closed record before the court after extensive pre-trial and trial proceedings.

As the court stated in *Seldovia Native Association:*

It has long been the view that motions for reconsideration should not be entertained

**8.** Edward Hinsberger was the Director of the Chicago Office of Multifamily Housing for HUD and a cross-designated witness in the case. Plaintiff had the opportunity to explore the voucher issue further had it chosen to do so on its direct examination of Mr. Hinsberger.

upon "the sole ground that one side or the other is dissatisfied with the conclusions reached by the court, otherwise the losing party would generally, if not always, try his case a second time, and litigation would be unnecessarily prolonged."

*Seldovia Native Ass'n Inc. v. United States,* 36 Fed.Cl. at 594 (quoting *Roche v. Dist. of Columbia,* 18 Ct.Cl. 289, 290 (1883)); *see also Totolo/King Joint Venture v. United States,* 89 Fed.Cl. at 444 (When considering motions for reconsideration, "which by their nature are addressed to the court's discretion, a court must exercise exceptional care and avoid unnecessarily prolonged litigation at the behest of a dissatisfied party.").

On a different theory, plaintiff now argues that the breach of the HAP contract between Englewood and HUD occurred on October 1, 2001, "when HUD refused to renew the 2000 HAP contract for a second year." For this reason also plaintiff seeks damages from October 1, 2001, rather than the July 1, 2002 date used by the court in its damages opinion. *See Englewood V,* 94 Fed.Cl. at 127. The court found that the HAP contract should have been renewed by HUD for three additional one year terms, from October 1, 2001 through September 30, 2004, but was not. *See Englewood II,* 79 Fed.Cl. at 530, 533–34. Although South Pointe required maintenance and repair to bring it up to acceptable condition, HUD did not afford Englewood the fair and meaningful opportunity to which it was entitled to perform the necessary maintenance and repairs of the facility. *Id.* at 542.

Attempting to incentivize Englewood's performance, rather than implementing the three additional, one year terms, HUD employed a series of short term contracts, culminating with a final close out date of September 30, 2002, two years short of when the HAP contract would have ended with the three one year renewals. *Id.* at 530, 533–34. In its liability opinion in *Englewood II,* the court noted that Mr. Hinsberger had sent Englewood an email on October 1, 2001, indicating that portable housing vouchers would be issued to South Pointe residents and that the HAP contract would be terminated once all of the tenants received their vouchers.

*Id.* In its damages opinion, *Englewood V,* the court found, however, that the impact of the issuance and exercise of the portable housing vouchers could be measured prior to the HAP contract close out date of September 30, 2002. By July 1, 2002, the voucher process was complete, the vacancy rates had increased dramatically, and the court found that "vouchers had a substantial effect on the occupancy at Englewood." *Englewood V,* 94 Fed.Cl. at 127. At trial, plaintiff had the burden to demonstrate not only that a breach of contract had occurred, but also to prove its damages, including from which date damages should start to run. Regardless of the date the HAP contract was breached by HUD, plaintiff did not demonstrate in the record before the court that its damages should be calculated prior to the July 1, 2002 date used by the court.

*Motion to Alter or Amend Judgment— OCAF Rent Increase*

In its September 3, 2010 motion to alter or amend judgment, plaintiff also re-argues its claim for damages based on an OCAF rent increase at South Pointe. The current request to reconsider the matter is the second request submitted by plaintiff for reconsideration of damages based on its claim of entitlement to an OCAF rent increase. Plaintiff also addressed the issue after the first post-trial request for reconsideration was denied in its post-trial briefing on HAP contract damages.

██ Plaintiff's pleadings, trial presentation and argument had relied on a budget-based claim, which was denied by the court. *See Englewood IV,* 86 Fed.Cl. at 726–27. The court denied plaintiff's budget-based rent increase claim, based on the absence of any properly signed and certified request for a budget-based rent increase having been submitted to HUD. *See Englewood III,* 84 Fed.Cl. at 651–54. Moreover, rents at South Pointe were agreed to by John J. Hayes, who controlled Englewood prior to Mr. Samuelson's involvement, such that any further increases above the agreed to amounts were waived by Englewood. *Id.* at 654. After plaintiff's budget-based claim was denied by the court, plaintiff shifted to an OCAF-based rent increase claim on its first motion to

reconsider. The motion was fully briefed by the parties. The court concluded that the first time plaintiff raised an OCAF claim was in the December 21, 2008 post-trial motion for reconsideration before this court. Plaintiff's OCAF claim, thus, was a new post-trial claim, based on a brand new theory. Plaintiff never had submitted an original OCAF claim to the agency, HUD, and had not included an OCAF claim in its pleadings filed earlier in this court. *Englewood IV,* 86 Fed. Cl. at 727.

Although not filed as a motion for reconsideration, plaintiff also had tried to raise the OCAF claim arguments in its opening, post-trial brief on HAP contract damages, and in its reply brief. Now, plaintiff raises its OCAF claim arguments, yet again, in its September 3, 2010, second, formal motion for reconsideration, and November 8, 2010 reply brief. As noted earlier, when considering motions for reconsideration, "which by their nature are addressed to the court's discretion, a court must exercise exceptional care and avoid unnecessarily prolonged litigation at the behest of a dissatisfied party." *Totolo/King Joint Venture v. United States,* 89 Fed.Cl. at 444. The present case has reached the stage of "prolonged litigation." Plaintiff's arguments with respect to the serial reconsideration of an OCAF claim, once again, are rejected.

*Motion to Alter or Amend Judgment—Vacancy Rate*

■ In addition, plaintiff argues that the court's damages calculation should have used a 3% vacancy rate at South Pointe, rather than the 9.5% vacancy rate used by the court. *See Englewood V,* 94 Fed.Cl. at 127–28 & 128 n. 7. Plaintiff's argument in this regard also is not new. Plaintiff acknowledges that the higher vacancy rate adopted by the court was based on plaintiff's need to vacate two floors of South Pointe for purposes of the rehabilitation of South Pointe pursuant to the 221(d)(4) loan. Plaintiff, nevertheless, again argues that normal maintenance could have been performed without vacating floors, and further suggests that,

absent HUD's breach, South Pointe would not have needed the rehabilitation. As indicated in the court's damages opinion in *Englewood V,* however, the record reflected that Englewood's need to refinance its loan, and its preference for a HUD loan with concomitant extensive rehabilitation of South Pointe, predated HUD's breach of the HAP contract:

> The record reflects Englewood had been attempting to obtain a section 221(d)(4) loan insured by HUD for the purpose of performing substantial rehabilitation since 1999. In fact, it had asked HUD to insure a section 221(d)(4) multimillion dollar loan for rehabilitation in 1999, twice in 2001, and again in 2002. Englewood, however, offered no specific evidence to demonstrate it had spoken to any other lenders about alternative types of loans. Therefore, plaintiff has failed to prove it had any intention of taking out a different loan if given the opportunity. Since plaintiff has the burden of proof, this court finds that while the 97% rate of occupancy argued for by plaintiff was appropriate before plaintiff began substantial rehabilitation on South Pointe, from December 2002 (the month the loan was finalized) until the end of the contract, it should be assumed that two floors remained unoccupied (9.5% vacancy or 90.5% occupancy) for the purpose of calculating damages.[9]

*Id.* at 128. The need to vacate two floors for the rehabilitation of South Pointe was a reasonable part of the damages calculation by the court. Plaintiff has not provided previously, unavailable information that would cause the court to revisit its earlier conclusions on the vacancy rate used in its damages opinion in *Englewood V.* Plaintiff's arguments with respect to reconsideration of the vacancy rate are denied.

### CONCLUSION

For the foregoing reasons, plaintiff has not demonstrated an adequate basis to reopen the judgment to permit additional discovery. Nor has plaintiff demonstrated an adequate basis to alter or amend the court's

---

**9.** In *Englewood V,* the court stated in a footnote, "South Pointe had twenty-one floors of units: twenty floors of apartments and one level of two-story townhouses. Nineteen floors occupied out of twenty-one equals 90.5% occupancy (19/21 = .9048)." *Englewood V,* 94 Fed.Cl. at 128 n. 7.

August 4, 2010 judgment. Plaintiff's motion for additional discovery is **DENIED.** Plaintiff's motion to alter or amend the judgment is **DENIED.** Costs to the defendant for the motion for additional discovery and the motion to alter or amend the judgment.

IT IS SO ORDERED.